**WM. H. WISE & CO., Inc., Plaintiff,**

v.

**RAND McNALLY & COMPANY, Defendant.**

United States District Court
S. D. New York.
May 29, 1961.

Breed, Abbott & Morgan, New York City, for defendant; Thomas W. Kelly, New York City, of counsel.

DAWSON, District Judge.

This action was tried by the Court without a jury. It is an action to recover damages resulting from defendant's alleged conversion of plaintiff's property. The parties stipulated that the case would be determined by applying the law of New York.

### The Facts

Plaintiff, Wm. H. Wise & Co., Inc. (hereinafter referred to as "Wise"), is a publishing concern. The defendant, Rand McNally & Co. (hereinafter referred to as "Rand"), is a printing establishment. Under an agreement dated on or about July 19, 1955, Wise engaged Rand to print 25,000 copies of plaintiff's book entitled "Complete Book of Home Decorating." Under the agreement Wise was to furnish the paper stock and to pay the defendant $8,050 for making positives, color separations, engravings and press plates for printing. In addition Wise was to pay 16 cents per copy for press work and 41.1 cents for binding. Wise furnished the manuscript and art work, drawings, photographs, linotype composition, cover dies and jackets Rand printed the work in accordance with the agreement.

On November 16, 1955, plaintiff instituted in this court an arrangement proceeding under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. Rand filed a proof of claim on May 23, 1956, in which it alleged that Wise still owed it $20,335.18 for printing copies of the work and that it, Rand, held approximately 13,915 copies of the work as security for the indebtedness. Wise filed objections to this claim on the ground, among others, that defendant's security had not been evaluated. This was followed by the filing, in the arrangement proceeding, of a stipulation between the parties, dated July 27, 1956; which fixed the value of the 13,915 copies held by Rand at $10,017.59, one-half the in-

Levine, Rembar & Zolotar, New York City, for plaintiff; George Zolotar, New York City, of counsel.

debtedness admitted by wise.[1] In its capacity as unsecured creditor, Rand accepted plaintiff's plan of arrangement which was affirmed on August 2, 1956. The sum of $10,017.59 was allowed Rand as an unsecured claim for which it might receive payments under the plan. The balance of $10,017.59 was treated as a claim secured by copies of the work then held by Rand.

From time to time during the arrangement Wise paid monies to Rand to obtain copies of the book and Rand simultaneously released certain copies. Following the confirmation of the plan, correspondence took place between the parties with reference to the procedure to be followed for the liquidation of the secured debt and the release of the books securing that debt. On December 19, 1957, Wise wrote to Rand saying:

"Referring to our agreement of last October whereby we were to clean up the balance of the open account for $2935.00 by December 27, 1957, which balance has since been reduced to $2455.00, we find that we will need more time to liquidate this item."

On January 7, 1958, this letter was acknowledged in a reply which said, among other things:

"I'm not quite sure what our plans are about the Decorating Book. We shall be glad to receive orders from you at anytime subject, of course, to prior sale."

By January 14, 1958, the secured indebtedness had been reduced to $1,430.59 and Rand still had in its possession over 7,000 copies of the work. Wise thereafter requested Rand to release another 250 copies of the book on payment of $125. Defendant complied with this request and the books were received on January 23, 1958. In March, 1958, plaintiff sought a release of additional books. Rand then notified Wise for the first time that it had sold 7,288 books at a private sale on January 14, 1958. The books were sold to Lord & Bond Corporation for a total price of $2,550.80. At the time that they were so sold the balance of the original secured claim was only $1,430.59. The testimony of plaintiff was that it was then in a position to pay this amount to defendant if final demand had been made for this amount, or if it had been notified that the books were to be offered for sale in satisfaction of the lien thereon. The sale of the books was made by Rand at a private sale without notice to Wise that the books were to be sold, and without giving Wise an opportunity to redeem them at or prior to the sale.

1. Rand argues that as a result of the Chapter XI arrangement and particularly the stipulation entered into whereby Wise' obligation to Rand was to be considered one-half secured and one-half unsecured, property in the books in Rand's possession vested in Rand McNally. A Chapter XI arrangement does not and cannot affect secured creditors. 8 Collier, Bankruptcy, ¶ 9.32 at pp. 1262–64 (14th Ed. 1941); Securities & Exchange Comm. v. United States Realty & Improvement Co., 1940, 310 U.S. 434, 452, 60 S.Ct. 1044, 84 L.Ed. 1293; In re Journal-News Corp., 2 Cir., 1951, 193 F. 2d 492. Although a court under Chapter XI may not deal with the rights of secured creditors, the court does have the power to stay foreclosure of any lien. Bankruptcy Act, § 314, 11 U.S. C.A. § 714; 8 Collier, supra, ¶ 3.22; In re Atlantic Steel Prod. Corp., D.C.

E.D.N.Y.1939, 31 F.Supp. 408. To the extent a partially secured creditor is unsecured he may participate in the arrangement. In re Everick Art Corp., 2 Cir., 1930, 39 F.2d 765, 768.

Contentions that the stipulation entered into had the effect of either abandoning the security for the debt or transferring title in the creditor by an official act of the court, are wholly without foundation. The stipulation was not pursuant to court order; it was effective only on contractual terms. Insofar as Rand participated in the arrangement to the extent of one-half the debt, it abandoned its security for that portion. In re O'Gara Coal Co., 7 Cir., 1926, 12 F.2d 426, 428–29, 46 A.L.R. 916. The result of the stipulation and the arrangement was merely to leave Rand a secured creditor pursuant to the original contract. It had no other effect.

## The Issue

The question is whether the defendant is liable in conversion for failure to give plaintiff notice of the time and place of the private sale of the books which defendant was holding as security.

## Discussion

### Type of Contract

Rand contends that the basic contract was one of sale and that it had an unpaid seller's lien which it could satisfy by selling the goods without previous notice to Wise. Section 141 of the New York Personal Property Law, McKinney's Consol.Laws, c. 41 gives an unpaid seller a right of resale "where the buyer has been in default in the payment of the price an unreasonable time." Subsection 4 adds: "It is not essential to the validity of a resale that notice of the time and place of such resale should be given by the seller to the original buyer." If the transaction under consideration constituted a sale, and if Wise was in default an unreasonable time, then no action will lie against Rand. The Court must, therefore, first determine whether it is dealing with a sale, or a contract for work, labor and materials.

■ A sale is generally a transfer of interest in personal property, but not every transfer of personal property constitutes a sale. Halsted v. Globe Indem. Co., 1932, 258 N.Y. 176, 179–80, 179 N.E. 376, 377. Where a party undertakes to convey specific goods, which he does not ordinarily keep on hand, the undertaking may be a contract to manufacture specific goods within the Sales Act. This is especially likely where the manufacturer is in the business of producing similar items on order. But a manufacturer might not be a seller within the Sales Act. He might instead be engaged in providing services pursuant to contracts for work, labor and materials.[2]

■ Where service predominates, and the transfer of personal property is only incidental to the transaction, it is a contract for work, labor and materials and not a sale. Perlmutter v. Beth David Hospital, 1954, 308 N.Y. 100, 104, 123 N.E.2d 792, 794 (transfer of blood merely incidental to hospital services); Crystal Recreation Inc. v. Seattle Ass'n of Creditmen, 1949, 34 Wash.2d 553, 209 P.2d 358 (construction of special fixtures); Town of Saugus v. B. Perini & Sons, 1940, 305 Mass. 403, 26 N.E.2d 1 (construction of a road).

Where the person ordering the manufacture, supplies the bulk of the materials used in the completion of production, it is generally a work, labor and materials contract and not a sale.[3] Ackerman & Hartnick, Inc. v. Berkowitz, Sup.Ct., App.Term, 1924, 123 Misc. 937, 206 N.Y.S. 624. Cf., Cooke v. Millard, 1875, 65 N.Y. 352, 358.

Contracts for printing and binding, such as that now before the Court, have been considered by other courts. A leading English case, Clay v. Yates, 1 H. & N. 73, 25 L.J., Ex. 237 (1856) concerned a contract to print a book. The issue for

2. This dichotomy has been much discussed in the cases. For example, a contract to paint a picture, Racklin-Fagin Const. Corp. v. Villar, Sup.Ct., App.Term, 1935, 156 Misc. 220, 281 N.Y.S. 426; a contract to construct and install fixtures in a beauty parlor, Carlson, Holmes & Bramstad, Inc. v. M. I. Stewart & Co., Sup. Ct.1932, 147 Misc. 607, 264 N.Y.S. 277, affirmed, 1935, 246 App.Div. 522, 283 N.Y.S. 430; a contract to construct a cider tank to specifications, M. K. Smith Corp. v. Ellis, 1926, 257 Mass. 269, 153 N.E. 548; and a contract to construct a special trailer body, Sidney Stevens Implement Co. v. Hintze, 1937, 92 Utah 264, 67 P.2d 632, 111 A.L.R. 331, were all held to be contracts for work, labor and materials.

3. But the single factor of who supplies the majority of materials is not dispositive. Thus in Hargraves Mills v. Gordon, 1910, 137 App.Div. 695, 122 N.Y.S. 245 and People ex inf. Gordon v. Sumergrade, Sp.Sess.1944, 47 N.Y.S.2d 850 the fact that the "buyer" supplied the materials gave way to the overriding intent of the parties. In both cases the court concluded that, since the parties had intended to enter into a contract of purchase and sale, that was the effect of their arrangement.

which the case is most often cited is whether it was a contract of sale or a contract for work, labor and materials. Pollock, C. B., said:

"* * * it seems to me the true rule is this:—*whether the work and labour is the essence of the contract, or* whether it is *the materials* that are found." (Emphasis of the court.) Martin, B., then said:

"I think the plaintiff was employed to do work and labour, and supply materials for it, and he is to be paid for it; and it really seems to me that the true criterion is this: Supposing there was no contract as to payment, and the plaintiff had brought an action, and sought to recover the value of that which he had delivered, would that be the value of the book as a book? I apprehend not, for the book might not be worth half the value of the paper it was written on."

Thus the court concluded that a contract to print and bind a book, even where the printer provides the paper and other materials, is a contract for work and labor and not a sale. This holding was cited with approval in Lee v. Griffin, 121 Eng. Rep. 716, 1 B. & S. 272 (1861).

A similar position has been taken in American courts. Gross Income Tax Division v. W. B. Conkey Co., 1950, 228 Ind. 352, 90 N.E.2d 805 considered a situation almost identical with that at bar. Conkey, the taxpayer, conducted a business of printing and binding books. They received orders from publishers who would furnish the manuscript and in certain instances the paper. After publication the books were held by Conkey until a signed order was received, at which time they would be delivered to the carrier f. o. b. The court there held:

"Its [Conkey's] contracts were not for the sale of books, nor for a sale of the materials furnished by appellee which went into the books, but for work, labor and materials which ultimately resulted in the transfer of a chattel made especially for the buyer and not suitable for sale to others in the ordinary course of appellee's business. By the weight of authority in this country such a contract would not amount to a sale * * *. Also by the adoption of the Uniform Sales Act * * * this state has recognized the rule that contracts such as we have here are not contracts for the sale of goods * * *. We do not believe, however, where, as here, the contract is for the printing of a book that the transaction would ever become or result in a sale. After delivery the appellee's claim would still be for work, labor and material." 90 N.E.2d at page 807.[4]

In the instant matter Wise furnished the bulk of the materials to be used in production. Rand was to print the book and bind it. Incidental to these functions, Rand supplied the printing and binding material. The essence of this contract was one of service. Rand was not selling books as books but rather was engaged to print and bind, pursuant to a contract. The contract was one of work, labor and materials and not one of sale.[5]

Since the Court is not dealing with a contract of sale, Rand's contention that it had an unpaid seller's lien is invalid *ab initio*. As such it is not neces-

4. While this Court recognizes that the question in the Conkey case was whether a sale existed for taxation purposes, the court's analysis remains valid in the present matter. Similar dispositions were made in two other taxation-printing cases. H. G. Adair Printing Co. v. Ames, 1936, 364 Ill. 342, 4 N.E.2d 481; J. A. Burgess Co. v. Ames, 1935, 359 Ill. 427, 194 N.E. 565.

5. This is true despite the fact that the contract appears on the face of a standard purchase order in which various terms of sale are employed. A party's characterization of a transaction is not binding on the Court; the Court must determine the character of the transfer from the totality of the facts. Perlmutter v. Beth David Hospital, 1954, 308 N.Y. 100, 107, 123 N.E.2d 792, 796.

sary to go into a detailed discussion of whether Wise had been in default an unreasonable time.[6]

*Type of Lien*

 As a result of Rand's work, pursuant to the contract for work, labor and materials, Rand became a lienor. While it is contended by Wise that Rand was a pledgee, that argument is without foundation.[7] A pledge, in the usual or conventional sense, arises when one known as a pledgor delivers property into the possession of a pledgee, that property to be held as security for the repayment of a debt or the fulfillment of some other obligation. Restatement, Security, § 1 (1941). Rand did not obtain possession of the books for purposes of security.

Rand had a possessory lien.

"Where a bailee has the privilege of retaining a chattel, not failed for the purpose of securing the payment of a debt or the performance of some other act by the bailor, until some demand of the bailee against the bailor has been satisfied, the interest of the bailee is a possessory lien." Restatement, Security, § 59 (1941).

Rand's possessory lien might be considered one of bailment which arises when a person ordering the manufacture or production of items provides some or all of the materials pursuant to a contract for work, labor and materials. See, People ex inf. Gordon v. Sumergrade, Sp.Sess.1944, 47 N.Y.S.2d 850; Hargraves Mills v. Gordon, 1910, 137 App.Div. 695, 122 N.Y.S. 245.

Alternatively, Rand's lien might be considered an artisan's lien. Wise supplied the paper and other materials; Rand was to improve the paper by printing the book and binding it. Section 180 of the New York Lien Law, McKinney's

---

6. Even if this were a contract of sale, it could not be found that Wise was in default an unreasonable time. The question of whether or not an unreasonable time has expired is determined according to the circumstances. In view of the continuing negotiations between Rand and Wise concerning the liquidation of the debt, and particularly in light of Rand's letter of January 7th, where the Treasurer said: "I'm not quite sure what our plans are about the Decorating Book," Wise cannot be held to have been in default an unreasonable time. Thus resale pursuant to an unpaid seller's lien, without notice, would constitute a conversion. See Higgins v. California Prune & Apricot Growers, Inc., 2 Cir., 1926, 16 F.2d 190.

7. It has also been argued by Rand that the negotiations and communications between Wise and Rand that spanned in excess of two years constituted more than a single transaction and that if the original contract was not a sale then, either the stipulation that was peripheral to the Chapter XI arrangement was a sale itself, or, at the very least, a pledge. The negotiations which culminated in the stipulation, whereby half of Rand's claim was secured and half was unsecured, was not a sale. Half the debt was denominated as secured and from that time the parties negotiated to draw down the security while liquidating the debt.

If it were to be held that the stipulation resulted in a pledgor-pledgee relationship, still Rand stands on no better ground. Where the actions of a pledgee are such that they may be deemed a waiver of the strict requirements of the obligation, he may not thereafter act as if no such waiver had taken place. Toplitz v. Bauer, 1899, 161 N.Y. 325, 55 N.E. 1059. As in the Toplitz case, if this were a pledge, such a waiver would have occurred. When in the letter of January 7th Rand said that it did not know what its plans were in regard to the books, this constituted a waiver of Rand's right to demand immediate settlement and a waiver of Rand's right to claim default. In addition, the good faith required of a pledgee, if Rand were to be held a pledgee, might be questionable, for on the trial, testimony suggested that by January 7th negotiations to sell the books to Lord & Bond were under way. This was earlier admitted by Rand in its answers to interrogatories.

However, neither a sale nor a pledge was the effect of the stipulation. A review of the correspondence between the parties makes it clear that they regarded the original contract as still existing and that they were engaged in an attempt to liquidate their mutual obligations. See Washington Elec. Co-op., Inc. v. Norry Elec. Co., 2 Cir., 1951, 193 F.2d 412.

Consol.Laws, c. 33, concerning artisan's liens, states:

"A person who makes, alters, repairs or in any way enhances the value of an article of personal property, at the request or with the consent of the owner, has a lien on such article, while lawfully in possession thereof, for his reasonable charges for the work done and materials furnished, and may retain possession thereof until such charges are paid."

See United States v. Toys of the World Club, Inc., 2 Cir., 1961, 288 F.2d 89; In re Tele King Corp., D.C.S.D.N.Y.1955, 137 F.Supp. 633.

*Conversion*

In order to recover in an action in conversion, Wise must establish that it has title or that it has right to immediate possession, or that it has some property in the chattel in question. Kaufman v. Simons Motor Sales Co., 1933, 261 N.Y. 146, 149, 184 N.E. 739, 740; Pompez Exhibition Co. v. Flatto, 1941, 261 App.Div. 613, 26 N.Y.S.2d 654; Clements v. Yturria, 1880, 81 N.Y. 285, 287; Laurent v. Williamsburgh Sav. Bank, Sup.Ct.1954, 137 N.Y.S.2d 750, 754–55.

Wise supplied the bulk of the materials to Rand. It retained property in those materials, for, even if the parties had treated their transaction as one of sale and resale, still New York would consider it a bailment for the purpose of production or improvement, with title remaining in the supplier. Mack v. Snell, 1893, 140 N.Y. 193, 198, 35 N.E. 493. When Rand added materials, such as binding, to the Wise supplied bulk, title to the Rand portion vested in Wise under the rules of accession; i. e., where

one party adds or attaches some of his property to the property of another, so that the other's property is preponderant, the latter obtains title to the whole. Sattler v. Hallock, 1899, 160 N.Y. 291, 293, 54 N.E. 667, 46 L.R.A. 679; Mack v. Snell, supra. See Hargraves Mills v. Gordon, supra, 122 N.Y.S. at page 249.

On the strength of the fact that Wise has title in the entire book, such title arising from its original ownership of the basic materials and accession of materials added by Rand, Wise' claim for conversion is well founded.

Some form of notice was required before Rand could foreclose its possessory lien by selling the books to a third party.[8] As the holder of a common law possessory lien, Rand would not have the right to sell the property held. United States v. Toys of the World Club, Inc., supra; Restatement, Security, § 72. If Rand is deemed an artisan's lienor under New York Lien Law § 180, then it could only foreclose on its lien pursuant to the enforcement provisions of the New York Lien Law, § 200 et seq. A sale without the notice required in § 201 would make Rand liable for conversion. Herschenhart v. Mahlman, Sup.Ct., App.Term, 1925, 125 Misc. 887, 213 N.Y.S. 48.

The circumstances surrounding the resale were as follows: In a letter dated December 19, 1957, Wise asked Rand for more time in which to liquidate their debt on the books. On December 30th 250 books were ordered and a check in payment of that order was drawn on January 6th. Rand answered the letter of December 19th on January 7, 1959, saying that they were "not quite sure what our plans are about the Decorating Book. We shall be glad to receive orders from you anytime subject, of course, to

8. This would be true even if Rand were a pledgee. A pledgee's duty of notice and advertisement, though not imposed by statute, is imposed by "the general maxims of equity." In re Kiamie's Estate, 1955, 309 N.Y. 325, 330, 130 N.E. 2d 745, 747. In addition the pledgee must conduct the sale in good faith for the benefit of the pledgor. Id. at 309

N.Y. 331, 130 N.E.2d 748. A sale without such notice constitutes a conversion. Toplitz v. Bauer, 1899, 161 N.Y. 327; Keleher v. O. Edwin Barnes, Inc., 1932, 236 App.Div. 760, 259 N.Y.S. 398. See generally, Small v. Housman, 1913, 208 N.Y. 115, 101 N.E. 700; First Trust & Deposit Co. v. Potter, Sup.Ct.1935, 155 Misc. 106, 278 N.Y.S. 847.

prior sale." The order of December 30th was received on January 23rd. Prior thereto, on January 14th, and without previous notice, Rand consummated a sale to Lord & Bond of the entire remaining stock. The sale under these circumstances was without notice and constituted a conversion.

### Damages

A plaintiff who has been injured by defendant's conversion is entitled to receive damages whereby he may be made whole. The general measure of damages is the fair and reasonable market value of the goods converted at the time of conversion. Bankers Commercial Corp. v. Mittleman, Sup.Ct.1960, 21 Misc.2d 1096, 198 N.Y.S.2d 184. Where, however, a fair market value is not readily ascertainable, plaintiff may recover the actual value of the property. D. Appleton & Co. v. Zeese-Wilkinson Co., Sup.Ct., App.Term, 1931, 140 Misc. 653, 251 N.Y.S. 532. Moreover, the fact that the damages are unliquidated, or difficult to compute, does not prevent their award. Lynch v. Plesch, Sup.Ct., 8 Misc. 2d 612, 167 N.Y.S.2d 885, affirmed 1957, 4 App.Div.2d 945, 168 N.Y.S.2d 620; MacGregor v. Watts, 1938, 254 App.Div. 904, 5 N.Y.S.2d 525.

### Conclusion

The Court has concluded that the sale by Rand of the remaining books, which it was holding as security, to Lord & Bond, without notice to Wise, without giving Wise an opportunity to bid thereon, constituted a conversion. Accordingly, Wise may recover the fair market

value of 7,288 books at the time of conversion. The plaintiff put in very little proof on the issue of what those damages might be. No expert testimony was offered as to the value of the books. Wise offered testimony that it was selling these books to ultimate purchasers at a list price of $4.95, at a discount of 40% to retailers, and a 60% discount to wholesale distributors. However, the amount Wise could get for the books by using its selling organization, its advertising, etc., is no indication of the market value of the books. The best evidence as to the market value at the time of conversion is the price Rand actually received for them from Lord & Bond. It may be assumed that Rand, in seeking to liquidate its investment in these books, was trying to get the best price it could for them. The net price it got was $2,550.80. In the absence of any other proof as to the market value of these books, the Court is forced to take this as the fair market value of the books at the time of the conversion.

The Court therefore finds that the damages due to Wise from the conversion is the sum of $2,550.80. In addition, Wise is entitled to interest from the date of conversion. Keilson v. City of New York, N.Y.Mun.Ct.1953, 126 N.Y.S.2d 606. The amount due Wise from Rand, however, should be reduced by the remaining balance of the secured debt, i. e., $1,430.59 Arakjinjian v. Arakian, 1944, 268 App.Div. 41, 48 N.Y.S.2d 501. Thus Wise may recover $2,550.80, plus interest [9] from January 14, 1958, the date of conversion, minus the outstanding debt due Rand of $1,430.59.

Let judgment be entered accordingly.

9. Ordinarily a successful plaintiff in a conversion action would be entitled to costs. However, since the passage in 1958 of the amendment to Section 1331 of Title 28 of the United States Code, the District Court may deny costs to the plaintiff, and, in fact, may impose costs on the plaintiff where the final judgment, without regard to any set-off or counterclaim, is less than $10,-000. Pursuant to Section 1331 the plaintiff, Wise & Co., is denied costs.