451 P.2d 587

**MOJAVE URANIUM COMPANY, a Nevada corporation, Plaintiff and Appellant,**

**v.**

**MESA PETROLEUM COMPANY, Defendant and Respondent.**

No. 11286.

Supreme Court of Utah.

March 5, 1969.

Robert M. McRae, of Hatch & McRae, Herschel J. Saperstein, Salt Lake City, for appellant.

James R. Brown and Robert G. Pruitt, Jr., of Neslen & Mock, Salt Lake City, for respondent.

HENRIOD, Justice:

Appeal from a summary judgment of no cause of action in a case where Mojave claimed Mesa assumed an obligation of Standard Gilsonite to pay a claim held against the latter by Mojave that existed over three years earlier, and which Mesa allegedly took over by acquiring the assets and liabilities of Standard in September, 1965. The trial court said that although there may have been such an obligation, it was discharged in bankruptcy. We affirm with costs to Mesa.

Back before 1962, Standard Gilsonite, under the pilotage of one Pinder, became indebted to Mojave, and, with personal property of highly questionable value, signed a note and chattel mortgage, which latter was recorded. Standard became insolvent and on May 25, 1962, filed a petition under Chapter XI of the Bankruptcy Act,[1] (known as the Chandler Act of 1938) said chapter having to do only with *unsecured* creditors as opposed to other types of claims.[2] Thereafter Mojave,

1. United States Code, Title 11 Secs. 701–799.
2. See 9 Collier on Bankruptcy (14 Ed.) Sec. 8.01, p. 157, which states as follows: "The limitation on an arrangement under Chapter XI so that it can deal only with *unsecured* creditors is one of the principal fundamental differences between a Chapter XI proceeding and a proceeding under Chapter X, XII, or XIII. Under Chapter X, secured as well as *unsecured* debts, and right of stockholders, may be affected by a plan of reorganization. Under Chapter XII, debts secured

which technically was a *secured* creditor, some time in June, 1962, in an agreement signed by Standard and Mojave, acknowledged that Standard was insolvent, that the latter had filed under Chapter XI, and that "This agreement is entered into with the knowledge that unless a Chapter XI * * * is successful, Mojave would receive nothing, or very little, by way of their present secured position." These concessions were made over three years before the instant action was instituted, but the "prime" attorney, as plaintiff calls him, virtually confirmed the worthlessness of the so-called security in his deposition. Nonetheless, this agreement which released the security in exchange for an unsecured claim, must have impressed the trial judge, as it does us, that the transmutation of a secured debt into an unsecured claim was designed for no other reason or purpose than that Mojave could take advantage of Chapter XI and salvage something from Standard's insolvency, rather than nothing. Hardly could one venture the conclusion that any such a stance could result three years later in any retransmutation to a status prior to Standard's filing under Chapter XI—so far as equity is concerned. We believe that all things being equal, unless the Bankruptcy

Act itself condones such a chameleonic result,—at least in equity, someone should not have his cake and eat it,—should be estopped to tie a new knot where a predecessor one had been untied,—or should be held to have waived, abandoned or otherwise deserted any novel claim asserted years later,—whatever you choose to classify or define it.

This brings us to the Chandler Act itself and the Zavelo case [3] with which appellant so urgently and not without merit tantalizes us. He contends that irrespective of all else, Zavelo says that the time at which the debt is *determined* is the *date that the petition was filed,*—none other. He quotes 9 Collier, Sec. 7.05, p. 22, volunteering that "following the rule of Zavelo v. Reeves," "thus, the general time of cleavage, insofar as determining whether a person is a *creditor* is the date of the filing of the Chapter XI petition in a section 322 * * *." The Collier statement necessarily does not justify counsel's gratuity of "following the rule of Zavelo v. Reeves," in the atmosphere in which the text discussion was conducted. Collier did not cite Zavelo in support of the statement. It is conceded that Zavelo has been cited by Collier and by dozens of cases involving regular bankruptcies since 1898

by real property or a chattel real of a debtor, and *unsecured* debts, may be affected by an arrangement, but *unsecured* debts alone can not be affected. Under Chapter XIII, secured and *unse-* *cured* debts may be affected by a wage earner's plan." (Emphasis supplied.)

3. Zavelo v. Reeves, 227 U.S. 625, 33 S.Ct. 365, 57 L.Ed. 676 (1913).

in support of the rules that 1) only debts existing at the time of filing the petition are provable and 2) a provable debt dischargeable in bankruptcy effectively may be revived or payable by virtue of a clear, unequivocal promise to pay. We have found no case in our research that cites Zavelo as being applicable to a Chapter XI case,—nor has counsel cited one.

We believe the reason that Zavelo is not applicable to a Chapter XI case is because of its incompatibility with the widely extended objectives of the Chandler Act and its modified philosophy designed to prevent bankruptcy rather than merely to furnish a sanctuary immunizing one against continuous harassment in a hopeless situation of financial despair.

Chapter XI itself seems to evince such purpose and malleability designed to save rather than sink a debtor. Counsel for plaintiff quite fairly and frankly seems to concede the change represented by the new law which in much greater degree favors the distressed debtor over his brethren of yesteryear. He says:

> * * * Upon the filing of a Chapter XI proceeding the debtor is brought within the protective umbrella of the court which, under the Act can issue various protective orders for the benefit of the debtor and his business, all with a mind to keep the business going and to give the debtor breathing space while he attempts to work out a satisfactory arrangement with his *unsecured* creditors.

Sections of Chapter XI call for (356) provisions for changing rights of unsecured creditors, (357) treating the claims on a parity or division into classes, with treatment in different ways or on different terms, for continuation of a debtor's business, to *provide payment of debts incurred after the filing of the petition and during the pendency of the arrangement,* retention of jurisdiction by the court, and for "any other appropriate provisions not inconsistent with this chapter."

Such provisions would seem to anticipate and cover a case such as we have here, where a creditor may have a claim purportedly secured by personal property that virtually appears to be worthless, and where the creditor might, after the filing of the petition, agree to release or waive such security, and say, (all of which seems to be the case here) "I acknowledge I am a secured creditor, but almost in name only, and being an unsecured creditor now and in reality, I will submit to the conditions of an arrangement, after the filing, but before the order confirming any arrangement is concluded."

It seems to us that where a creditor takes such a position at the time of his debtor's adversity, hardly can it say subsequently and after three or four years of quiescence that "Now that you have be-

come ·prosperous, I will advise that whatever I did to change my creditor status, I now disconfirm, confirming my status at the time that you filed your petition, and disconfirm the order confirming the arrangement, and I do this under the authority of Zavelo v. Reeves, although I am unable to find a case citing this landmark decision in a Chapter XI, Chandler Act environment." Counsel for appellant, I opine, will espouse a somewhat different conclusion, but the trial court's result in this case points up the difference between 1898 and 1938. The only cases, which are not numerous, nonetheless support the thesis that in a Chapter XI proceeding, Zavelo is not controlling as to dischargeability based on the date of filing the petition. Rather, they support respondent's urgence that unsecured claims are determinable and dischargeable as of the date the · arrangement ultimately is confirmed under the provisions of Sections 367 and 371 of the Act,—and such a conclusion does not seem terribly unreasonable considering the obviously new approach under the Chandler Act, and under the apparently on-again-off-again factual switches in this case in an apparent effort to gain creditor advantage, but upon failure to accomplish such advantage, attempt to revert to a creditor status that appellant completely had abandoned, deserted and waived.

■ Without abstracting the facts in the cases mentioned hereunder we commend the reader to some that seem ,to conclude that the order confirming the arrangement in a Chapter XI case determines the rights of *all* unsecured creditors who were such at the *time of confirmation,* irrespective of their status at the time a petition was filed.[4]

This court has but fleeting kinship with federal bankruptcy matters, to which counsel for appellant no doubt will amen, but respects the pronouncements of the federal· courts that have a greater closeness and acquaintance with the federal bankruptcy laws,—with which the instant case is concerned. In McAbee v. Isom,[5] Circuit Judge Sibley said "It thus appears that a claim proven as a secured claim is al-. ways potentially an unsecured one. If the

---

4. Frey v. Frankel, 361 F.2d 437 (1966), where a contract entered into after a Chap. XI petition was filed and before confirmation of an arrangement ensued, Judge Pickett of the Tenth Circuit, in which our court also sits, said * * * "when the *order of confirmation became final, the rights of the party were fixed as of its entry,* * * * When the plan became effective, Frey's position with the corporation was terminated, and he had no legal right to employment." In Wm. H. Wise & Co. v. Rand McNally & Company, 195 F.Supp. 621 (D.C.1961), during pendency of a Chap. XI proceeding, a secured creditor at time of the filing entered into a stipulation that made it a half secured and half unsecured creditor, and as to the unsecured phase, the order of confirmation, not the date of filing the petition, was controlling.

5. 116 F.2d 1001 (5 Cir. 1940), decided after the 1938 Chandler Act.

security fails in whole or in part the equity of the case will generally require that recognition be given the unsecured debt." In re: Berkshire Hdw. Co.,[6] the court recognized that the Zavelo rule that only those debts provable at the time of a petition for bankruptcy has been modified by the provisions of the 1938 Chandler Act.

■ Two other points on appeal persist: 2) That regardless of a discharge of the alleged debt, it was revived and made enforceable by Standard's June, 1962, agreement to pay it. This claim admittedly was worth nothing or very little. The so-called agreement, which appellant must have renounced, since in this suit it said it remained a secured creditor, has the complexion of inconsistency seemingly engendered by one Pinder, president of Standard, then of Mesa, and a relative of and intermediary for those of Mojave, which, according to this record reasonably could convince a trial judge that the alter-ego-paterfamilias relationship was designed to recover something now, failing which, reservation of rights might provoke a second and possibly a third try to revive a

corpse that may, by some sort of miracle, resurrect itself. We go along with the trial court in discounting Point No. 2 on the facts. Point No. 3, that there was an enforceable contract for the benefit of a third party, is as unimpressive as Point No. 2. It appears that the trial court, under the facts of this case, highly confusing and contradictory as they are, without any sworn testimony save that contained in a deposition of a lawyer that added little to, but detracted from clarity, decided, as did the state court, to let the corpse of this case rest in peace.

■ It is not reflected in the record by findings and/or conclusions, what the trial court specifically had in mind about points 2 and 3, but it is not difficult to conclude that from the elusiveness of the record, where no promissory note definitely was executed, or for that matter unconditionally intended, as was the case of a chattel mortgage, apparently never executed, or intended, the trial court was not in error.[7] At best, the record reflects failures to comply with conditions, executions of documents, recordation or delivery of papers

---

6. 39 F.Supp. 663 (D.C.1941).
7. This court, in many cases has indulged the presumption that where the trial court did not make a specific finding on a particular phase of a case, that if such finding had been made it would be in harmony with the decision rendered. Probably the best statement of this proposition was made by Mr. Justice Wade in Mower v. McCarthy, 122 Utah 1, 245

P.2d 224 (1952), where it was stated that "In reviewing a case of this kind where issues of fact are involved and there are no findings of fact, we do not review the facts but assume that the trier of the facts found them in accord with its decision, and we affirm the decision if from the evidence it would be reasonable to find facts to support it."

vital to appellant's last two points. It seems that the trial court reasonably could disagree with appellant, where the only "live" testimony,—that of the so-called "prime" lawyer's deposition and an affidavit, reflected, in its and our opinion, a fact situation that, if believed by the trial court, negated any unequivocal, unconditioned promise to pay anything to anyone in a definite amount. Among other things it was conditioned on other kinfolk creditors agreeing on the same terms, which the record does not reflect materialized, and a take-over agreement that seemed to be a family or Pinder arrangement, without any real evidence of execution or delivery, does not impress us with appellant's urgence.

We believe that this case represents a belated effort to salvage something from a situation forgotten but brought to mind by change of circumstance, technical bankruptcy talk, hope for renewed existence of a given-up effort, supplemented by a 1913 Zavelo pronouncement, which we deem not authoritative under Chap. XI of the Chandler Act of 1938, or the facts of this case.

CALLISTER and TUCKETT, JJ., concur.

1. Pettingill v. Perkins, 2 Utah 2d 266, 272 P.2d 185.
2. To be distinguished from situations where the position of one or both parties is that,

CROCKETT, Chief Justice (concurring):

I concur in affirming the judgment, adding these observations:

I have no doubt that if it be shown that a debtor desired that a particular debt be paid, and that he made a valid contract with a third party for that express purpose, the latter would be bound to fulfill that obligation. But this case was not presented to the court below on that theory and we should not be concerned with it on appeal.[1] In the posture in which this case was presented to the trial court, where both parties moved for summary judgment on the basis of the pleadings, deposition and documentary evidence, and where each insists that it is entitled to judgment as a matter of law,[2] the fair and reasonable inference to be drawn is that Mesa Petroleum Company took over the assets and liabilities of Standard Gilsonite in such a way as to stand in its shoes.

It is important that plaintiff Mojave was fully informed of the Chapter XI bankruptcy proceeding in which it was originally listed as a secured creditor; and that the so-called new promise to pay the Mojave obligation was made in connection with changing itself to an unsecured creditor

if the summary judgment is denied, they will present proof which will entitle them to recover. See West v. West, 15 Utah 2d 87, 387 P.2d 686.

status. This occurred in June and thus two months before the order of confirmation of the Referee in Bankruptcy which acts the same as a discharge in bankruptcy as to the unsecured creditors.[3]

ELLETT, Justice (dissenting):

I dissent. This case can be determined upon a basis not related to the rules of a bankruptcy proceeding, to wit, upon a third party creditor beneficiary contract. It was decided in the court below upon a motion for summary judgment, and in order for the ruling to stand, the defendant had to be entitled to judgment as a matter of law. In my opinion the law is against the defendant on the issue raised, to wit, whether bankruptcy discharged a debt of another corporation.

On September 10, 1965, Standard Gilsonite Company entered into a written agreement with the defendant, Mesa Petroleum Company, whereby Mesa took over all the assets (except certain specified funds) of Standard and promised to pay all debts of Standard set forth in Exhibit "A" attached to the agreement. The debt of Mojave in the amount of $20,000 was listed on the document attached.

If we assume that the opinion of the court is correct[1] in holding that the claim of Mojave was barred by the Chapter XI proceeding of Standard, that is not to say that this defendant can take refuge behind the bankruptcy of Standard. A discharge in bankruptcy does not remove from a bankrupt the moral obligation to pay the debt. It simply takes the right to sue away from the creditor. The obligation on the part of the discharged debtor to pay is a sufficient consideration to support a definite promise made by him to pay that debt, and the old creditor can sue on the new promise as made.[2]

In this case the suit against Mesa is not based upon the old promise made by Standard. It is upon a new promise made by Mesa to pay a debt which Standard owed to the plaintiff, a debt which Standard never did pretend that it did not owe. Its books always showed the debt to be a liability owing to Mojave. It is only Mesa which claims that Standard did not owe the debt, ergo Mesa did not owe it.

Even if Standard did not owe the debt, still it could have made Mojave a donee beneficiary by requiring Mesa to pay Mojave in return for taking the assets of Standard. Whether Standard owed Mojave or not is of no concern to Mesa.

The law in this regard is succinctly stated in 4 Corbin on Contracts, § 818, where the cases are collected. It says:

3. Sec. 371, Chap. 11 of the Bankruptcy Act; and see Poly Industries Inc. v. Mozley, 362 F.2d 453 (9 Cir. 1966).

1. Which I do not do.
2. Zavelo v. Reeves, 227 U.S. 625, 33 S.Ct. 365, 57 L.Ed. 676, 678 (1913).

Observe further that the promisee may have many good defenses in a suit brought against him by the third party that would not be operative in a suit against the promisor by the third party. The contract may have been made by the promisee for the purpose of settling some ill-founded claim of the third party; * * * The duty owed by the promisee to the third party may have become barred by statute of limitations or in bankruptcy; such a bar will not avail the promisor. * * *

Enough is stated here to convince me that Mesa should not be relieved of its promise to pay Mojave. However, since this is a dissent, I will point out what I consider to be other defects in the reasoning of the main opinion.

I cannot agree with the main opinion holding that the claim of Mojave was barred even as to Standard. Standard filed its petition under Chapter XI of the Bankruptcy Act, which chapter affects only the *unsecured* creditors of a debtor. An arrangement with the unsecured creditors was proposed on May 25, 1962, and was confirmed by an order signed August 13, 1962. The arrangement made no provision for the secured debts but did list that of Mojave in Schedule "B" as a secured debt.

Standard was advised by its counsel that it would have to deal with the secured creditors separately and individually and would have to resolve those secured debts as best it could. In his deposition, said counsel stated that the intention was to compromise and settle the secured claims and not to list them in the arrangement proceedings. Pursuant to the advice of counsel, Standard did make separate agreements with Mojave, Field Services, and Tennessee Gas. Thereafter settlements were made with all save Mojave.

At the time of filing its petition, Standard's books of account showed a debt owing to Mojave in the amount of $26,000, some $18,325.82 of which was secured by a second mortgage on mining equipment, on certain automobiles, and on its office furniture and fixtures. The debt was payable at the rate of $20 per ton of ore mined.

Sometime in June, Standard and Mesa entered into a new agreement whereby Standard promised to sign a new note for $20,000, to give a chattel mortgage to secure the note, and to pay it off at the rate of $2,000 per year in place of the original debt. Mojave released its second mortgage, but Standard never did sign a note nor give a chattel mortgage for the substituted debt. Thereafter Standard carried the debt on its books at $20,000.

I would think that the unsecured part of the debt was covered by the confirmation. While no unsecured debt of Mojave was listed, still Mojave knew of the proceedings and, therefore, would be bound to the extent of the unsecured portion of the debt.

The main opinion says that the case of Zavelo v. Reeves[3] applies to regular bankruptcies only. The language of the case is clear:

It is settled, however, that a discharge, while releasing the bankrupt from legal liability to pay a debt that was provable in the bankruptcy, leaves him under a moral obligation that is sufficient to support a new promise to pay the debt. And in reason, as well as by the greater weight of authority, the date of the new promise is immaterial. The theory is that the discharge destroys the remedy, but not the indebtedness; that, generally speaking, it relates to the inception of the proceedings, and the transfer of the bankrupt's estate for the benefit of creditors takes effect as of the same time; that the bankrupt becomes a free man from the time to which the discharge relates, and is as competent to bind himself by a promise to pay an antecedent obligation, which otherwise would not be actionable because of the discharge, as he is to enter into any new engagement. And so, under other bankrupt acts, it has been commonly held that a promise to pay a provable debt, notwithstanding the discharge, is as effectual when made after the filing of the petition and before the discharge as if made after the discharge.

The reasoning therein stated applies to Chapter XI proceedings as well as to ordinary bankruptcies. Where is the line of cleavage between debts and assets belonging to the bankruptcy court and those belonging to the petitioner in a Chapter XI proceeding? If that line is at the time of filing the petition, then the creditors will be listed and will receive notice of future proceedings. They should vote either to approve or reject the proposed arrangement. In fact, a creditor without knowledge who is omitted from the arrangement is not bound by the confirmation thereof.[4] To hold all unsecured debts incurred after the petition has been filed but before confirmation to be barred might make it impossible for a debtor to raise the necessary funds to offer his creditors in his proposed arrangement. His earnings after the filing of his petition should be his, so that he could carry out his proposed plans; and if the earnings are his, his new debts incurred in making this money likewise should be his, and his alone.

The question involved is discussed in 3 Collier on Bankruptcy, § 63.04, as follows:

The firmly established general rule is that the provability of a claim depends upon its status at the time the petition is filed. The general rule, however, is now subject to certain statutory qualifications. The Act of 1938 provides in

---

3. Id.

4. 9 Am.Jur.2d, Bankruptcy § 1331.

§ 63b that "in the interval after the filing of an involuntary petition and before the appointment of a receiver or the adjudication, whichever first occurs, a claim arising in favor of a creditor by reason of property transferred or services rendered to the bankrupt for the benefit of the estate shall be provable to the extent of the value of such property or services." This new provision derogates from the general principle that claims accruing after bankruptcy follow their own and special rules of allowance and do not constitute provable claims within the provisions of §§ 57, 63. Likewise, the Act of 1938 makes provable "contingent debts and contingent contractual liabilities" and expands the provability of claims for anticipatory breach of executory contracts. But aside from such specifically provided exceptions the principle prevails that "the filing of the petition is the crucial time in nearly all matters arising in bankruptcy proceedings, provided adjudication follows." * * * *

What this seems to say is that creditors may not share in assets under a plan when the obligation is incurred after the petition is filed unless the debt is incurred by the bankrupt so as to bring assets into the estate for further distribution among the creditors. It does not say that the debt is discharged. It simply says that the creditor may participate. . . . . . . .

In this matter nothing was brought into the bankrupt's estate because, as the opinion of the court points out, the second mortgage had become practically worthless.

None of the cases relied upon in the prevailing opinion, as I interpret them, support the conclusions drawn therein. Let us examine them:

In Frey v. Frankel, 361 F.2d 437 (10 Cir. 1966), a corporation filed a petition pursuant to Chapter XI of the Bankruptcy Act. Frey, the former president and chief stockholder of the corporation, undertook to raise funds with which to finance an arrangement. During preliminary discussions between Frey and Frankel, they decided that a change in ownership of the controlling stock would be required and that the plan to be submitted would provide that Frey should be given an option to purchase one third of the new stock, and in addition he would have a five-year contract of employment at a salary of $2,000 per month. The creditors would not approve the proposed plan. Thereafter Frey submitted a different plan, which was approved by the creditors, wherein Frankel was to be chief managing officer and Frey was given no right to purchase the stock nor to have a five-year contract. This plan was confirmed by the court, and the charter of the corporation was amended to provide for the issuance of the new stock.

Frey and Frankel fell out, and this action resulted, wherein Frey claimed damages

for not getting a five-year contract of employment at $2,000 per month; for rescission and so forth; and for his share of the stock. Since neither Frey's option to purchase nor his employment agreement was included in the plan, he had no rights under that plan, and what the court held in effect in the case was that when the order of confirmation became final, the rights of the parties were fixed as of its entry. There was no holding that a debt of the corporation incurred subsequent to the filing of a petition was discharged. The corporation was the debtor in the proceedings, and all that the holding in this case amounts to was that Frey never got any rights because they were not stated in the arrangement.

Another case relied upon in the prevailing opinion is that of Wm. H. Wise & Company, Inc., v. Rand McNally & Company, 195 F.Supp. 621 (D.C.1961). There the plaintiff furnished material and engaged the defendant to print and bind 25,000 copies of a book for it. Wise filed for arrangement proceedings, and Rand McNally filed a proof of claim for some $20,035.18 and stated that it held almost 14,000 copies of the book as security for the debt. Wise filed objections on the ground that the value of the security had not been evaluated. Finally, the parties stipulated that the value of the books held was $10,017.59, which was exactly one half of the amount of the debt due and owing.

The other one half of the debt was allowed as an unsecured claim for which the defendant might share in the payments under the plan. Rand McNally ultimately sold some 2,000 copies of the book to a third person without notice to Wise. The question before the court was whether the defendant was liable for conversion of the books sold. The case is interesting if one cares to learn about liens and conversion, but I do not find any holding or even any discussion to the effect that a debt incurred subsequent to filing of a petition is barred by confirmation.

Another case relied upon by the main opinion is McAbee v. Isom, 116 F.2d 1001 (1940), (not 116 F. 1001 as cited). There a creditor filed her claim originally as a secured creditor. At the time, she had the real property of the debtor under attachment in an action pending in a state court. When a prior attachment defeated the security of the creditor, she moved to amend her claim to show it as being unsecured. This amendment was disallowed by the trial court. The Fifth Circuit Court of Appeals reversed and held that the amendment should have been permitted. The case does not hold that an unsecured debt acquired after the filing of a petition is barred by confirmation. It simply is not in point. The debt pre-dated the filing of the petition and was, unknown to the creditor, unsecured all of the time.

The other case relied upon by the prevailing opinion is that of In re Berkshire Hardware Co., Inc., 39 F.Supp. 663 (D.C. 1941). There the law of the state required an employer to pay a percentage of its payroll into a state fund. The bankrupt was an employer and paid its contributions to April 1, 1939. On March 22, 1939, an involuntary petition in bankruptcy was filed against the employer, and on June 19 of that year it was adjudicated a bankrupt. A receiver was appointed and continued the business until July 11, 1939, when a trustee was appointed, who ran the business thereafter for a short time. The receiver and the trustee paid the contributions during the time they operated the business. The state filed a claim for contributions due from April 1, 1939, to June 19, when the receiver took over. This claim was filed after the filing of the petition and was for a debt incurred subsequent to said filing. The claim was disallowed by the referee. In discussing this matter the court held:

> There is ample authority for the proposition that debts provable under section 63 of the Bankruptcy Act, 11 U.S.C.A. § 103, include only those existing at the time of the filing of the petition in bankruptcy. Zavelo v. Reeves, 227 U.S. 625, 33 S.Ct. 365, 57 L.Ed. 676, Ann.Cas. 1914D, 664; Williams v. United States Fidelity & Guaranty Co., 236 U.S. 549, 35 S.Ct. 289, 59 L.Ed. 713; In re Miller, D.C., 25 F.Supp. 336.

This rule has been modified by the provisions of section 63, sub. b of the Bankruptcy Act of 1938, 11 U.S.C.A. § 103, sub. b, known as the "Chandler Act." This new section permits a claim, arising after the filing of an involuntary petition, to be proved if it arises by reason of property transferred or services rendered by the creditor to the bankrupt for the benefit of the estate. The claim of the Commonwealth of Massachusetts cannot be said to come within the scope of this section. The claim, therefore, is not provable as a debt.

If, however, as the Commonwealth contends, the Massachusetts Unemployment Compensation Law imposes a tax rather than creates a debt, a different situation is presented. The first question to be considered, therefore, is whether the "contributions" required by that law may be regarded as a tax.

That court held the claim to be allowable because it was a tax and not a debt. There a claim was filed, and was disallowed as a *provable claim for debt*. The court did not hold that the debt was discharged. It merely held that the claimant would not be allowed to share in the assets for distribution if the claim was based upon a debt which was incurred after the filing of the petition.

Defendant herein also attempts to raise the question of a lack of consideration for the debt which Standard owed in the first place. Since the suit is upon the promise of Mesa and not upon the promise of Standard, this would no more be a defense to this defendant than would bankruptcy.

I would reverse the trial court and remand the case for the entry of judgment in favor of plaintiff and against defendant for $20,000. I would also award costs to the appellant.