STATE of Utah, Plaintiff and Appellee,

v.

Charles Chapman THAMER II, Defendant and Appellant.

No. 870078.

Supreme Court of Utah.

June 22, 1989.

J. MacArthur Wright, St. George, for defendant and appellant.

David L. Wilkinson, J. Stephen Mikita, Salt Lake City, for plaintiff and appellee.

STEWART, Justice:

Charles Chapman Thamer II appeals from his convictions of burglary, rape, and forcible sodomy. We affirm.

## I. THE FACTS

In November of 1985, Sherrie W., the victim, resided with her three children, ages eight, four, and twenty-two months, at the Black Hills Apartments in St. George, Utah. During the night of November 17, her boyfriend spent part of the evening with her. They engaged in sexual intercourse, and he left her apartment at approximately 11:30 p.m. Sherrie thereafter locked the doors and turned off all the lights except for two, one in her children's bedroom walk-in closet, which partially illuminated the hallway between the children's bedroom and Sherrie's bedroom, and another above the stove in the kitchen. The drapes were drawn throughout the house. Then she retired.

Later Sherrie awakened and observed a man standing in the hallway next to the open door of the children's room. The light from the children's closet illuminated half of the intruder's face. Surprised, Sherrie watched the man for about three minutes before he turned and walked down the hallway away from her bedroom. When the man moved, Sherrie got up and put on a robe. Suddenly, someone slammed her against her bedroom wall, cutting her lip in the process. A strong, broad-shouldered man attempted to cover her eyes and mouth as she screamed loudly. During this encounter, Sherrie was again able to observe the man.

The assailant told Sherrie that he wanted to have sex and then he would leave. Conversation continued throughout the entire episode, approximately one and one-half hours, allowing Sherrie multiple opportunities to note the defendant's speaking habits. She described his speech as slow and deliberate, almost as if he had learned English as a second language.

During the assault, the man removed Sherrie's robe and underwear and pushed his own pants down to his knees or ankles. He lay on Sherrie and attempted to pen-

etrate her, but she testified that she did not feel any penetration and that the assailant had not achieved an erection. The man made other unsuccessful attempts to penetrate and to have oral sex by fellatio, all the while keeping his hand or a pillow over Sherrie's eyes. At one point, the man had Sherrie put his thumb into her mouth and instructed her to suck on it.

Again attempting oral sex, the man ejaculated in her mouth. She spit out the semen onto what she thought were bed sheets. Thereafter, the man left by the front door. After summoning the police, Sherrie stated that she thought the assailant resembled a man who had been dating her next door neighbor, Cindy Harrison. The next day, she described the assailant to an officer who drew an incomplete composite sketch from Sherrie's descriptions. Sherrie also described the attacker to some of her friends.

Lab tests were performed on fluid samples from Sherrie's vagina and mouth and two semen stains found on the bed sheet to determine the blood characteristics of her assailant. None of the tests found evidence of body fluids matching those of the defendant.

A few weeks or months later (Sherrie thought it was early January), one of Sherrie's neighbors, Debbie Jensen, saw and talked with a man who she later testified met Sherrie's description. While the man was standing outside Sherrie's apartment, she telephoned Sherrie and told her to look out the window. Sherrie recognized the man as her assailant and also as the man who had previously dated her neighbor.

After seeing the man outside her apartment, Sherrie called the police and identified the defendant as her assailant. An investigating officer, Officer Dobson, later showed three mug shots of the defendant to Cindy Harrison, the defendant's former girlfriend, to have her identify them. Ms. Harrison identified the man in the photos as a former boyfriend. As Dobson was leaving, Sherrie arrived, and he showed the photos to Sherrie, apparently without authority from his superior officer. Sherrie immediately identified the defendant as her assailant when she saw the photo of the clean-shaven defendant. The defendant was arrested four or five months later after police officers completed further investigative work.

At a pretrial suppression hearing, the defendant argued that showing the three mug shots to Sherrie tainted her identifications of the defendant at the preliminary hearing and would taint an in-court identification at trial. The trial court ordered the three mug shots suppressed unless the defendant "open[ed] the door" by discussing the incident on cross-examination. The court also ordered the identification at the preliminary hearing suppressed because the defendant was the only person in the courtroom dressed in prison garb and accused of the crime. However, the trial judge refused to suppress an in-court identification at trial because he found that Sherrie's ability to identify the attacker on the night of November 17 was not tainted by her having viewed the three mug shots of the defendant. At the hearing on the motion, the court also denied a motion to suppress other prior identifications and a composite drawing.

## II. RELIABILITY OF IN–COURT IDENTIFICATION

The defendant argues that Sherrie's in-court identification was inadmissible because of the taint of prior suggestive identification procedures. Specifically, he contends that the photo array containing three photographs, all of the defendant, which showed him alternatively with a beard, a moustache, and clean-shaven, impermissibly suggested the identity of the assailant. He also asserts that the passage of time from the crime until the showing of the photo array (one to three months) and the victim's emotional need to know that her assailant had been apprehended influenced her to identify the defendant. Further, the defendant argues that Sherrie's statements concerning the identity of the assailant became certain only after her exposure to the photo array. Finally, he asserts that the accuracy of her in-court identification is doubtful because she had little opportunity

to observe her assailant during the attack and because of her initial uncertainty in identifying the assailant prior to her in-court testimony. In this connection, the defendant asserts that the police composite drawing "does not come very close to depicting the appellant."

We apply a two-step test to determine whether a pre-indictment or pre-information photo array is so suggestive that the subsequent admission of an in-court identification violates the due process clause.[1] First, we must determine whether there was a pretrial photographic identification procedure used which was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States,* 390 U.S. 377, 383, 88 S.Ct. 967, 970, 19 L.Ed.2d 1247 (1968). Second, if the photo array is impermissibly suggestive, then the in-court identification must be based on an untainted, independent foundation to be reliable. *See Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Reliability is, of course, the linchpin of the admissibility of identification evidence. *Id.*

■ Presentation of a photo array to a witness should not emphasize one photo more than another. The words and actions of law enforcement officials who present the photos should convey an attitude of disinterest, and the photographs themselves should not be selected so as to give greater prominence to one photograph. Thus, a photo array in which the individual characteristics of the accused, such as race, for example, stand in stark contrast to the other photographs is impermissibly suggestive. *See State v. Haynes,* 118 Wis.2d 21, 345 N.W.2d 892 (Ct.App.1984). Any manipulation indicating that the police believe one of the photographs portrays the ac-

cused could lead to a finding of suggestiveness. *See State v. Ervin,* 22 Utah 2d 216, 220, 451 P.2d 372, 374 (1969). However, a prior identification of the unique characteristics of the accused may offset an implication of suggestiveness. *See State v. Evans,* 463 So.2d 673 (La.Ct.App.1985); *State v. Welch,* 65 N.C.App. 390, 308 S.E.2d 910 (1983).

*Manson* held that admissibility depends on the totality of circumstances bearing on the reliability of the identification and that an identification based on a single photo is not per se impermissible. 432 U.S. at 114, 97 S.Ct. at 2253. *See also Welch,* 65 N.C. App. at 391–92, 308 S.E.2d at 911 (single photo identification not per se impermissible). Of the courts which have held that a showing of a single photograph is suggestive under some circumstances, most have held the in-court identification reliable under a totality-of-the-circumstances test. *See, e.g., Ruff v. Wyrick,* 709 F.2d 1219 (8th Cir.1983); *Wicks v. Lockhart,* 569 F.Supp. 549 (E.D.Ark.1983); *Holden v. State,* 602 P.2d 452 (Alaska 1979); *People v. Madonna,* 651 P.2d 378 (Colo.1982) (en banc); *People v. Pruden,* 110 Ill.App.3d 250, 66 Ill.Dec. 12, 442 N.E.2d 284 (1982); *State v. Nolan,* 93 N.M. 472, 601 P.2d 442 (1979); *Commonwealth v. Buehl,* 510 Pa. 363, 508 A.2d 1167 (1986). *But see State v. Jackson,* 454 So.2d 398 (La.Ct.App.1984); *People v. Lafayette,* 138 Mich.App. 380, 360 N.W.2d 891 (1984); *People v. Jackson,* 118 A.D.2d 655, 500 N.Y.S.2d 8 (1986).

■ Few opinions have dealt with whether an array showing several photographs of the same suspect only is unduly suggestive. *Dobbs v. Kemp,* 790 F.2d 1499, 1506 (11th Cir.1986), for example, held several photographs of a suspect in an array to be suggestive, but also held an in-court identi-

---

**1.** This case is distinguishable from, although related to, post-indictment or post-arrest cases where an accused has a Sixth Amendment right to counsel at a lineup. *See Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *United States v. Bierey,* 588 F.2d 620 (8th Cir.1978); *People v. Caruso,* 68 Cal.2d 183, 436 P.2d 336, 65 Cal.Rptr. 336 (1968). These cases may also be

distinguished from the present case because they involve actual, not photographic, lineups. In lineup cases not falling within the scope of *Wade* and *Gilbert,* the analysis is a due process analysis only, and the defendant must show that the lineup resulted in such unfairness that it infringed his right to due process of law. *Caruso,* 68 Cal.2d at 184, 436 P.2d at 337, 65 Cal.Rptr. at 337.

fication reliable. In our view, an array of several photographs of a single suspect is no more suggestive than one photograph, unless the array is of two or more people.

In the present case, there is no evidence of improper manipulation by the investigating officers. Prior to the photo identification, Sherrie had specifically identified the accused on different occasions as "the guy who went out with the girl that lived next door." Officer Dobson testified that he produced the mug shots only after Sherrie called him and again indicated a prior acquaintance with the defendant. Unlike *Manson* and other single-photo identification cases, her prior acquaintance with the accused produced a clear identification prior to the photo identification. The photographs shown to her were in response to her prior identification; her statements about the defendant were not prompted by her response to the photographs. *See Evans*, 463 So.2d 673. *But see Ruff*, 709 F.2d 1219.

■ The in-court identification was independent of the photographs and, under the totality of the circumstances, was reliable. *See Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). *See also State v. Malmrose*, 649 P.2d 56, 59 (Utah 1982); *State v. McCumber*, 622 P.2d 353, 357 (Utah 1980). The following factors are relevant in assessing the reliability of an in-court identification.

### 1. Opportunity to View Assailant

The defendant emphasizes the fact that Sherrie's observation occurred at night with only two lights on in the apartment. Sherrie's testimony established that, despite her short observation, she saw the assailant when she awoke, that she recognized him as having dated her next door neighbor, and that she had talked to him on at least one occasion prior to the attack. *Cf. McCumber*, 622 P.2d at 357.

### 2. Degree of Attention

Sherrie was no "casual or passing observer." *Manson*, 432 U.S. at 115, 97 S.Ct. at 2253. She was with the assailant for approximately sixty to ninety minutes. She saw his face at least twice, and at one time for up to three minutes. She heard his voice as he talked with her in a distinctive fashion which she recognized and described.

### 3. Accuracy of Description

Nothing in the record, either at trial or at the preliminary hearing, suggests that any of the victim's descriptions inaccurately described the defendant on the date of the attack. The defendant now requests this Court to compare the composite sketch to the mug shots shown by Officer Dobson to Sherrie because "the composite drawing does not come very close to depicting the appellant." That composite is not so different from the defendant's photos as to merit our independent review.

### 4. Level of Certainty

Although there is some language in the police report relating to the attack that suggests the possibility of some equivocation with respect to Sherrie's identification, her testimony showed confidence in the correctness of her identification. Moreover, she consistently identified the defendant as her assailant throughout the proceedings.

### 5. Passage of Time Between Crime and Confrontation

Although seven months passed between the crime and the preliminary hearing, Sherrie made a positive identification of the defendant only weeks after the attack when she saw him standing outside her window and her identification remained constant thereafter.

### III. OTHER EVIDENTIARY ISSUES

■ Sherrie testified that, during the assault, the intruder asked her to suck on his thumb. Sherrie's next door neighbor, Cindy Harrison, testified that she had a recent, short-lived sexual relationship with the defendant and that, on one occasion, he asked her to suck on his thumb. The defendant contends that, although admission of this evidence was discretionary with the trial

judge, the prejudicial effect of Cindy's testimony so far outweighed the probative value that the admission of this evidence was fatally prejudicial. The defendant also claims the evidence is irrelevant. We disagree. The evidence at issue showed unusual behavior that had little prejudicial effect and yet was reasonably probative of the identity of the perpetrator of the assault.

 The defendant's final argument on appeal is that the verdict of the jury is inconsistent with scientific evidence showing that the defendant's blood type was conclusively excluded from two semen deposits found on the victim's bedding.

The defense elicited testimony from an expert to the effect that the two semen stains found on Sherrie's bed sheet were examined and found inconsistent with the "B" antigen characterizing the defendant's body fluids. The expert found, instead, that the evidence demonstrated a type A secretor, such as Sherrie's boyfriend or an intruder other than the defendant. The defendant also asserts that when the assailant ejaculated into Sherrie's mouth, she either spit the semen out onto the sheets or let it fall onto the bed. Therefore, the defendant concludes, this evidence clearly demonstrates that he could not have committed the assault. We do not agree.

There are several possibilities why the defendant's guilt is not necessarily excluded by this evidence. First, the forensic serologist, Catherine T. Baker, testified that there was at least one other stain on the bed sheet that she did not examine. Second, the examiner testified that semen samples as old as 20 years have been tested and identified, but no evidence was submitted as to the age of the semen samples that were tested. Third, evidence showing that there was semen of the same blood type as Sherrie's boyfriend found inside Sherrie's vagina does not exclude the possibility that the boyfriend also left stains on her bed sheet. Fourth, Sherrie said that she did not actually see where the semen went after she spit it out. She testified, "I was laid against the sheet and I started spitting it out. It could have gone down the front of me; some of it could have gone on him. I have no idea." Finally, the investigating officer who took evidence from the scene mentioned taking a single bed sheet. No mention was made of the pillow used to cover Sherrie's eyes at various times throughout the ordeal. Nor did the officer mention the blanket which the assailant used to cover Sherrie after the assault. In short, the scientific evidence was simply not conclusive.

Affirmed.

HALL, C.J., HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.