STATE of Utah, Plaintiff and Appellee,

v.

Livio Alphonso RAMIREZ, Defendant
and Appellant.

No. 880425.

Supreme Court of Utah.

April 23, 1991.

Debra K. Loy, Richard G. Uday, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, Charlene Barlow, Salt Lake City, for plaintiff and appellee.

ZIMMERMAN, Justice:

Livio Alphonso Ramirez appeals his conviction of one count of aggravated robbery, a first degree felony. He challenges his conviction on several grounds, claiming, inter alia, that he was seized and searched in violation of the United States and Utah

Constitutions, that an eyewitness identification of him was unconstitutionally suggestive and unreliable, that the prosecutor made inappropriate and prejudicial remarks in his opening statement and closing argument, and that the evidence presented at trial was insufficient to sustain the conviction. We vacate the conviction and remand for retrial on grounds that in ruling on Ramirez's pretrial motion to suppress, the trial judge failed to make adequate findings and that absent the findings of fact and conclusions of law required by rule 12(c) of the Utah Rules of Criminal Procedure, it is impossible for us to determine the lawfulness of the stop and seizure. Utah R.Crim.P. 12(c).

Shortly before one o'clock in the early morning hours of August 13, 1987, Kathy Davis was preparing to leave the Pizza Hut at 787 North Redwood Road, where she was employed as manager. Her husband, John Davis, and her brother, Gerald Wilson, had come to visit her and accompany her home. As they left the building, they were accosted by a man wearing a white scarf across his face and carrying a metal pipe ("the pipe man"). He demanded that they give him the bank bag with the day's receipts. A brief scuffle ensued, during which the pipe man pushed Kathy inside her car. He then ordered her to return to the building to retrieve the bank bag. At some point in the scuffle, Wilson attempted to grapple with the robber. The robber hit Wilson with the pipe and then told a second robber ("the gunman") that if Wilson moved again, the gunman should kill him.

This was the first indication that a second robber was present. Wilson testified that the gunman was crouched near the corner of the building, holding a gun. The man, who also wore a white scarf covering most of his face, held the gun on Wilson while Kathy and John went back into the building and brought the bank bag out to the robbers. Both robbers then fled. The victims reported the robbery to the police, who responded within a few minutes. The victims described the robbers to the police, but the descriptions were somewhat conflicting.

A short time after the robbery, police officer Merrill Stuck was driving a marked police car northbound near 600 North and 1940 West. Officer Stuck had the headlights and radio turned off. He had not heard about the Pizza Hut robbery. As the darkened police car approached the intersection at 600 North, the officer saw two men walking south toward him. As the officer's car neared the two men, one ran east and disappeared from sight, while the other continued walking south. Officer Stuck turned on his radio and made a call, stating that he was going to stop someone and "shake them down." He then continued north to the intersection and stopped the man who had not run away, Livio Ramirez. Officer Stuck had not received any bulletins regarding the robbery or any other crimes that night, and he testified that Ramirez had done nothing to cause him to believe that Ramirez had committed a crime.

Testimony about what happened next conflicts. Ramirez testified that Stuck emerged from his car with his hand on his gun and said, "Hold it." Ramirez testified that Stuck then handcuffed him. At that point, a second officer, Robert Rackley, arrived.

Officer Stuck's testimony differed from Ramirez's testimony in several important aspects. Stuck's testimony at trial also contradicted his own testimony at the suppression hearing. At the suppression hearing, Stuck testified that when he encountered Ramirez, he only asked for identification, inquired why the other man had run away, and asked where Ramirez had been that night. Stuck testified that he did nothing to restrain Ramirez, but he also testified that it was "entirely possible" that he had ordered Ramirez to hold his hands up when first approaching him. Stuck said that after asking the question, he backed Ramirez up against a chain link fence. The record is unclear as to the degree to which Ramirez was physically constrained at that point.[1] Stuck testified that Officer Rack-

---

1. From the record, it appears that Officer Stuck may have handcuffed Ramirez before Officer

ley arrived shortly thereafter. Stuck's testimony at trial was essentially the same as at the suppression hearing, except that he further testified that he had searched Ramirez by patting him down prior to Rackley's arrival.

Rackley arrived a few minutes after Stuck stopped Ramirez. Rackley had heard Stuck's call about stopping a pedestrian. He also had received a bulletin about the Pizza Hut robbery, including descriptions of the robbers. Upon arriving, Rackley informed Stuck about the robbery and told him that Ramirez matched the description of a robbery suspect. Officers Rackley and Stuck searched Ramirez, and then Rackley handcuffed Ramirez to the fence by placing a second set of handcuffs through the fence and attaching them to the handcuffs Ramirez was wearing.

In the meantime, other police officers had been talking to the robbery victims at Pizza Hut. When word came over the radio that Stuck and Rackley had detained a suspect, the police drove Kathy Davis, John Davis, and Gerald Wilson to where Ramirez was detained to determine whether they could identify him as one of the robbers. When testifying later, the witnesses were confused as to the order in which they were taken to identify Ramirez and which of them were transported to the scene together. It is also unclear from the record exactly what the police told the witnesses about the person they were about to see, beyond a statement to the effect that the officers had found someone who matched the description of one of the robbers.

The identification showup then occurred under the following circumstances: It was approximately one o'clock in the morning. Ramirez, a dark-complexioned Apache Indian, was handcuffed to a chain link fence. He was the only suspect present and was surrounded by police officers. The police turned the headlights and spotlights from the police cars on Ramirez to provide enough light. The witnesses viewed Ra-

mirez by looking at him from the back seat of a police car. Of the three witnesses, only Wilson identified Ramirez as the masked man with the gun; the other two witnesses were unable to identify him as one of the robbers. Following the identification, Ramirez was placed under arrest and was charged with the robbery.

Prior to trial, the defense moved to suppress the out-of-court and in-court identifications by Wilson on grounds that the initial identification procedure gave rise to a substantial likelihood of irreparable misidentification and that the initial identification tainted subsequent identifications. Ramirez also moved to suppress all evidence seized from him, on grounds that the seizure violated his rights under the federal and state constitutions. The trial court denied the motion to suppress the identification, but took under advisement the motion to suppress based on unlawful stop and seizure. The trial judge never explicitly ruled on this pretrial motion.

At trial, Wilson appeared and identified Ramirez as the gunman. The defense entered continuing objections to the admission of evidence based on claims of illegal stop and seizure and suggestive identification procedures. Following Ramirez's conviction, the defense moved for a new trial, renewing its objections to the stop and seizure and to the identification and also objecting to the prosecution's opening statement and closing argument. The trial court denied the motion on grounds that the pretrial motion to suppress was properly denied and that the prosecutor's statements, though inaccurate, were not of such magnitude as to mislead the jury.

As noted, the record before us does not include an explicit ruling on the lawfulness of the stop and seizure. The trial court's minute entry denying the motion for a new trial reaffirms the court's earlier ruling refusing to suppress the evidence. The earlier ruling, however, does not state clearly whether the refusal to suppress is based only on a determination that the

---

Rackley arrived, as Ramirez claims. Officer Stuck says nothing about handcuffing Ramirez. However, Officer Rackley testified that when he

arrived, he handcuffed Ramirez to the fence by placing his cuffs through the cuffs that Officer Stuck had already placed on Ramirez.

identification procedure was lawful or also on an unrecorded ruling on the lawfulness of the stop and seizure.

Ramirez raises several issues on appeal. First, he claims that the introduction of the eyewitness identification violated his right to due process of law under article I, section 7 of the Utah Constitution and the fourteenth amendment to the United States Constitution because the identification was unreliable. Second, he claims that the stop violated article I, section 14 of the Utah Constitution and the fourth and fourteenth amendments to the United States Constitution because Officer Stuck did not have an articulable reason for making the stop. Third, he claims that the prosecutor's comments in his opening statement and closing argument prejudiced his right to a fair trial. Finally, he contends that the evidence presented at trial was insufficient to support a verdict of guilty.

We begin with the identification issue. Article I, section 7 of the Utah Constitution provides, "No person shall be deprived of life, liberty or property, without due process of law." Utah Const. art. I, § 7. Ramirez contends that he was denied due process when the prosecution was permitted to introduce the identification of him as the gunman. He argues that the circumstances surrounding the identification rendered it fatally unreliable.

Because our decision on this issue breaks new ground under the Utah Constitution, it seems appropriate to give a broad overview of the law surrounding the admission of eyewitness identifications. Of central importance is the burden that rests on the prosecution and the distinction between the role of the judge, as the arbiter of the constitutional admissibility of an identification, and the role of the jury, as the ultimate finder of fact. A failure to keep this burden and this distinction in mind can fatally flaw any conviction obtained through the admissibility of an eyewitness identification.

The parts played by the prosecution, the judge, and the jury with respect to identification evidence is analogous to the parts these parties play when confession evidence is at issue. The burden of demonstrating the admissibility of the proffered evidence is on the prosecution. It must lay a foundation upon which the trial court can make any necessary preliminary factual findings and reach any necessary legal conclusions. See, e.g., State v. Carter, 776 P.2d 886, 890 (Utah 1989); State v. Bishop, 753 P.2d 439, 463 (Utah 1988); State v. Wright, 745 P.2d 447, 451 (Utah 1987). The defendant is then entitled to a determination by the court of the evidence's constitutional admissibility. See Bishop, 753 P.2d at 463. If the court finds the evidence admissible, it may be presented to the jury. See State v. Branch, 743 P.2d 1187, 1189–90 (Utah 1987). In determining admissibility, the trial court will be required to resolve certain factual issues. Many of these same factual issues will be pertinent to the jury's determination as to whether to credit the admitted evidence. For example, in admitting the challenged evidence, the trial court may have to decide whether the defendant or a police officer is to be believed regarding the circumstances surrounding a confession or an eyewitness identification. Yet that issue will have to be decided anew by the jury when the evidence is considered. Id.

Potential for role confusion and for erosion of constitutional guarantees inheres in this overlap of responsibility of judge and jury to determine the same issue. Because the jury is not bound by the judge's preliminary factual determination made in ruling on admissibility, the trial court may be tempted to abdicate its charge as gatekeeper to carefully scrutinize proffered evidence for constitutional defects and may simply admit the evidence, leaving all questions pertinent to its reliability to the jury. But courts cannot properly sidestep their responsibility to perform the required constitutional admissibility analysis. To do so would leave protection of constitutional rights to the whim of a jury and would abandon the courts' responsibility to apply the law. Cf. State v. Rimmasch, 775 P.2d 388, 397–99 (Utah 1989) (discussing need for threshold reliability examination by trial court prior to admission of scientific

evidence, even though jury will ultimately determine weight). The danger of such an abdication of responsibility is particularly serious where the admissibility of an eyewitness identification is concerned because of the probability that such evidence even though thoroughly discredited has a powerful effect on a jury. *See State v. Long,* 721 P.2d 483, 490 (Utah 1986).

We turn now to an explanation of the analytical model to be used by a trial court in determining the admissibility of arguably suggestive eyewitness identifications under article I, section 7, the Utah due process provision. Under the federal constitution, the basic due process issue is whether the identification is sufficiently reliable to be admitted in evidence. *See Neil v. Biggers,* 409 U.S. 188, 198–99, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972); *State v. Thamer,* 777 P.2d 432, 435 (Utah 1989); *State v. Wulffenstein,* 657 P.2d 289, 291–92 (Utah 1982), *cert. denied,* 460 U.S. 1044, 103 S.Ct. 1443, 75 L.Ed.2d 799 (1983). Until our decision in *State v. Long,* 721 P.2d 483 (Utah 1986), we had never suggested that the standard under article I, section 7 of the Utah Constitution for determining whether an identification was admissible might diverge from the federal. In no instance had we undertaken a separate constitutional analysis. Our cases had simply applied the federal analytical model for determining the reliability, and hence the admissibility of the identification as that model had developed in the line of cases beginning with *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and continuing through *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). *See Wulffenstein,* 657 P.2d at 291–92; *State v. Malmrose,* 649 P.2d 56, 59 (Utah 1982); *State v. McCumber,* 622 P.2d 353, 357 (Utah 1980).

A necessary prelude to describing the state standard that emerges from *Long* is a discussion of the contrasting federal due process standard. The federal constitutional standard requires that the trial court, when confronted with an issue of the admissibility of an eyewitness identification, must preliminarily determine whether the identification is sufficiently reliable that its admission and consideration by the jury will not deny the defendant due process. In making that determination, the court is to consider "all the circumstances" surrounding the identification and appraise those circumstances in light of five factors which were identified by the United States Supreme Court in *Biggers* as important to a determination of the reliability of an identification. *Biggers,* 409 U.S. at 199, 93 S.Ct. at 382. These factors are

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.; see also Thamer,* 777 P.2d at 436; *Wulffenstein,* 657 P.2d at 291–92; *Malmrose,* 649 P.2d at 59; *McCumber,* 622 P.2d at 357. If, after performing this analysis, the identification is found to be unreliable, it is not to be admitted. *See Biggers,* 409 U.S. at 201, 93 S.Ct. at 383; *Foster v. California,* 394 U.S. 440, 443, 89 S.Ct. 1127, 1128–29, 22 L.Ed.2d 402 (1969); *Malmrose,* 649 P.2d at 59.

In *Long,* we were presented with the question of the reliability of eyewitness identifications in the context of a claim that an instruction cautioning the jury about the fallibility of such identifications was required where the accuracy of an identification was at issue. *Long*'s disposition of this claim laid the foundation for a separate Utah constitutional due process analysis of the reliability of eyewitness identifications.

To answer the cautionary instruction claims presented in *Long,* we reviewed the scientific literature and concluded that it "is replete with empirical studies documenting the unreliability of eyewitness identification." *Long,* 721 P.2d at 488 (citations omitted). We further noted:

Although research has convincingly demonstrated the weaknesses inherent in eyewitness identification, jurors are, for the most part, unaware of these prob-

lems. People simply do not accurately understand the deleterious effects that certain variables can have on the accuracy of the memory processes of an honest eyewitness. Moreover, the common knowledge that people do possess often runs contrary to documented research findings.

*Id.* at 490 (citations omitted). This led us to comment that "[p]erhaps it is precisely because jurors do not appreciate the fallibility of eyewitness testimony that they give such testimony great weight." *Id.*

We next observed that in this area, courts and lawyers tend to "ignore the teachings of other disciplines, especially when they contradict long-accepted legal notions." *Id.* at 491. As an example of such a "lag between the assumptions embodied in the law and the findings of other disciplines," we cited the Supreme Court's listing in *Neil v. Biggers*, 409 U.S. at 199, 93 S.Ct. at 382, of the five factors by which a court is to evaluate the reliability of an eyewitness identification for federal due process purposes. *Long*, 721 P.2d at 491. We noted that "several of the criteria listed by the Court are based on assumptions that are flatly contradicted by well-respected and essentially unchallenged empirical studies." *Id.* We then stated that "in the area of eyewitness identification, the time has come for a more empirically sound approach." *Id.* Although the empirical research might justify excluding all such evidence, we rejected such a step as impracticable. *Id.* at 492.

We did conclude, however, that if requested, a cautionary instruction about the weaknesses of eyewitness identification must be given whenever such an identification is "a central issue in a case." *Id.* The guidelines articulated in *Long* for such an instruction hewed to the teachings of the empirical research and diverged from the criteria listed in *Biggers* in several significant respects, which will be discussed in detail below. Pertinent to the Utah constitutional claims raised in the present case, we then observed:

> Given the great weight jurors are likely to give eyewitness testimony, and the deep and generally unperceived flaws in

it, *to convict a defendant on such evidence without advising the jury of the factors that should be considered in evaluating it could well deny the defendant due process of law under article I, section 7 of the Utah Constitution.*

*Id.* (emphasis added).

Turning to the present case, although the holding in *Long* was not squarely based on the state constitution, that case effectively committed us to an analytic course that diverges somewhat from that in federal case law regarding the admissibility of eyewitness identifications. *Long* teaches that we do not agree entirely with the *Biggers* listing of the relevant criteria for determining the reliability of eyewitness identifications and that we find some of those criteria to be scientifically unsound. *Long* committed us to the proposition that a jury should consider different criteria than those set out in *Biggers* when determining the reliability of eyewitness identifications. We are bound to apply those same criteria when the admission of that same evidence is contested on reliability grounds under the due process clause of article I, section 7.

We therefore hold that for purposes of determining the due process reliability of eyewitness identifications under article I, section 7, we will not limit ourselves to an analytical model that merely copies the federal. We will require an in-depth appraisal of the identification's reliability along the lines laid out by *Long*. We judge this to be a more appropriate approach. *See* Utah Const. art. I, § 7. Since this approach departs from federal case law only to the degree that we find the federal analytical model scientifically unsupported, we have no doubt that the more empirically based approach of *Long* will allow a court to consider fully "the totality of the circumstances" surrounding the identification, as required by *Biggers* and its progeny, or that the resulting reliability determination will meet or exceed in rigor the federal standard as expressed in *Biggers* and *Stovall*. *Biggers*, 409 U.S. at 199, 93 S.Ct. at 382; *Stovall*, 388 U.S. at 302, 87 S.Ct. at 1972.

The analytical model to be followed under article I, section 7 of the Utah Constitution is structured around the criteria discussed in *Long.* The ultimate question to be determined is whether, under the totality of the circumstances, the identification was reliable. In *Long,* we gave the following listing of the pertinent factors by which reliability must be determined:

> (1) [T]he opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly. This last area includes such factors as whether the event was an ordinary one in the mind of the observer during the time it was observed, and whether the race of the actor was the same as the observer's.

*Long,* 721 P.2d at 493.[2]

Although the factors enumerated in *Long* are generally comparable to the *Big-gers* factors, they more precisely define the focus of the relevant inquiry. In several respects, the *Long* factors differ from those of *Biggers.* In *Biggers,* the Court listed as a factor "the level of certainty demonstrated by the witness at the confrontation." *Biggers,* 409 U.S. at 199, 93 S.Ct. at 382. In *Long,* we criticized this factor and essentially rejected it as an indicator of an identification's reliability. *Long,* 721 P.2d at 490. Also, suggestibility is included in the fourth *Long* factor, with no comparable emphasis given to this element by *Biggers. Id.* at 493; *see also id.* at 493 n. 7 (*Telfaire* jury instruction); *id.* at 494 n. 8 (proposed *Long* jury instruction).

Before applying the foregoing due process analysis to the specific facts of this case, we address the applicable standard of review. The standard by which we review a trial court's decision to admit evidence of an eyewitness identification is essentially the same as that applicable to a trial court decision to admit a confession. Our task is to review the record evidence and determine from the totality of the circumstances whether the admission of the identification is consistent with the due process guarantees of article I, section 7.[3]

---

**2.** A finer analysis of these factors is reflected in the proposed instruction included in *Long. See Long,* 721 P.2d at 493, 494 n. 8. That analysis should be of assistance to the bench and bar in applying these factors when a challenge to the constitutionality of an identification arises.

**3.** We acknowledge that some of our cases have stated that the standard of review for certain threshold constitutional questions is whether the trial court committed clear error or abused its discretion. *See State v. Wright,* 745 P.2d 447, 451 (Utah 1987) (trial judge's determination of voluntariness of confession); *State v. Hegelman,* 717 P.2d 1348, 1349 (Utah 1986) (waiver of *Miranda* rights); *State v. Bolsinger,* 699 P.2d 1214, 1217 (Utah 1985) (voluntariness of confession); *State v. Perry,* 27 Utah 2d 48, 51, 492 P.2d 1349, 1352 (1972) (suggestiveness of identification). *But see State v. Bishop,* 753 P.2d 439, 463–64 (Utah 1988) (voluntariness of confession). However, a closer inspection of those cases reveals that the "abuse of discretion" terminology is used inappropriately. Whether a piece of evidence is admissible is a question of law, and we always review questions of law under a correctness standard. *Grayson Roper*

*Ltd. Partnership v. Finlinson,* 782 P.2d 467, 470 (Utah 1989); *City of West Jordan v. Utah State Retirement Bd.,* 767 P.2d 530, 532 (Utah 1988); *Mountain Fuel Supply Co. v. Salt Lake City Corp.,* 752 P.2d 884, 887 (Utah 1988); *Atlas Corp. v. Clovis Nat'l Bank,* 737 P.2d 225, 229 (Utah 1987); *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985).

When viewed closely, the cited cases appear actually to have applied this standard. The confusion is rooted in the fact that on occasion, the legal standard for admissibility of evidence vests a measure of discretion in the trial court. For example, Utah Rule of Evidence 403 requires that a trial court balance the probativeness of a piece of evidence against its potential for unfair prejudice; if the potential for unfair prejudice outweighs the probativeness, the evidence is excludable as a matter of law. Utah R.Evid. 403. The trial court initially performs that balancing. If it concludes that the evidence is admissible, we review that decision for correctness. But in deciding whether the trial court erred as a matter of law, we de facto grant it some discretion, because we reverse only if we conclude that it acted unreasonably in strik-

*See State v. Thamer*, 777 P.2d 432, 435 (Utah 1989) (federal constitutional analysis); *State v. Wulffenstein*, 657 P.2d 289, 291 (Utah 1982) (federal constitutional analysis); *cf. State v. Carter*, 776 P.2d 886, 890 (Utah 1989); *Bishop*, 753 P.2d at 464. In the present case, the trial court's decision to admit evidence of the identification was based on its evaluation of the disputed facts as presented by the parties and its application of the law to those facts. In reviewing the trial court's decision to admit, we defer to the trial court's fact-finding role by viewing the facts in the light most favorable to the trial court's decision to admit and by reversing its factual findings only if they are against the clear weight of the evidence. *See* Utah R.Civ.P. 52(a) (made applicable to criminal trials by Utah R.Crim.P. 26(7)); *State v. Walker*, 743 P.2d 191, 192–93 (Utah 1987); *see also Grayson Roper Ltd. Partnership v. Finlinson*, 782 P.2d 467, 470 (Utah 1989). On the other hand, whether these facts are sufficient to demonstrate reliability is a question of law, which we review for correctness. *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 887 (Utah 1988); *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985); *cf. Margulies v. Upchurch*, 696 P.2d 1195, 1200 (Utah 1985) (mixed questions of fact and law do not require deference given findings of pure fact).

We now consider the decision to admit the identification evidence in this case.

The first factor to be considered in determining the reliability of the identification is the opportunity of the witness to view the actor during the event. *See Long*, 721 P.2d at 493. Here, pertinent circumstances include the length of time the witness viewed the actor; the distance between the witness and the actor; whether the witness could view the actor's face; the lighting or lack of it; whether there were distracting noises or activity during the observation; and any other circumstances affecting the witness's opportunity to observe the actor. *See id.* at 494 n. 8.

In the present case, we find that statements by Wilson about the length of time he viewed the gunman varied from a "few seconds" or "a second" to "a minute" or longer. Wilson testified that the distance between himself and the gunman was about "ten feet," although testimony from another witness indicated that the distance was up to thirty feet. The three witnesses testified that the gunman was crouched near the end of the building, wearing a mask over the lower part of his face. None of the witnesses, including Wilson, were able to see his face during the robbery. Wilson testified that he could not see the gunman's eyes clearly but he "could see enough to know" and that the gunman had small eyes. Wilson testified at one time that there were no obstructions between him and the gunman and at another time that the pipe man was between him and the gunman. Wilson and the other

---

ing the balance. *See State v. Verde*, 770 P.2d 116, 120 (Utah 1989); *State v. Cloud*, 722 P.2d 750, 752–53 (Utah 1986); *State v. Garcia*, 663 P.2d 60, 63–65 (Utah 1983). If we conclude that the trial court erred, we may characterize that ruling as "an abuse of discretion," but in reality, we have found that the court committed legal error and that the unfairly prejudicial potential of the evidence outweighs its probativeness. *See, e.g., Bishop*, 753 P.2d at 475; *Verde*, 770 P.2d at 120; *Cloud*, 722 P.2d at 752–53.

Similarly, in deciding whether a confession is voluntary or an identification is reliable, the trial judge may have to weigh conflicting testimony as to the circumstances surrounding the confession or identification. *See, e.g., State v. Carter*, 776 P.2d 886, 890 (Utah 1989); *Bishop*, 753 P.2d at 461–63; *Wright*, 745 P.2d at 451; *State v. Fulton*, 742 P.2d 1208, 1211–12 (Utah 1987). In reviewing the trial court's decision to admit, which includes the determination of which version of facts to believe, we review for correctness. But a correctness review necessarily incorporates a review of the trial court's resolution of factual questions and the associated determination of credibility that may underlie the decision to admit. This subsidiary determination will be overturned only if clearly erroneous. Utah R.Civ.P. 52(a); *Bountiful v. Riley*, 784 P.2d 1174, 1175 (Utah 1989); *Grayson Roper*, 782 P.2d at 470–71. Again, it is possible that we might refer casually to this standard of review as an "abuse of discretion" standard. In fact, it is not. It is a correctness standard, which incorporates a clearly erroneous standard for the review of subsidiary factual determinations. That is exactly what occurred in our decision in *Wright* and is the source of statements in cases such as *Wright* that we review for an abuse of discretion.

witnesses generally described the lighting as good, but on occasion, they described it as poor and stated that the gunman was in a shadowy area.

The second reliability factor is Wilson's degree of attention to the gunman. *Id.* at 493. Wilson was fully aware that a robbery was taking place. Even though the pipe man was still threatening and swinging the pipe at Wilson after Wilson saw the gunman, Wilson testified at the preliminary hearing that he did not look at the pipe man. Although at the time of the robbery Wilson's description of the pipe man was much more detailed than his description of the gunman, Wilson testified at trial that he stared at the gunman, trying to get a good description, and that he did not see the pipe man as clearly as he saw the gunman.

The third reliability factor is whether the witness had the capacity to observe the actor during the event. *Id.* Here, relevant circumstances include whether the witness's capacity to observe was impaired by stress or fright at the time of the observation, by personal motivations, biases, or prejudices, by uncorrected visual defects, or by fatigue, injury, drugs, or alcohol. *See id.* at 494 n. 8.

In the present case, Wilson struggled with the pipe man, who hit Wilson in the stomach with the pipe once and nearly hit him a second time. Wilson was then threatened by a masked robber who was pointing a pistol at him; at the same time, the pipe man was still threatening· to hit him with the pipe. Although the record does not describe the stress or fright that Wilson experienced, under the circumstances it is reasonable to assume that Wilson experienced a heightened degree of stress. We have no basis in the record to know whether Wilson acted under any personal motivations, biases, or prejudices. Wilson described his eyesight as good with his glasses. Aside from the late hour and the injury from the pipe blow, there is nothing in the record to indicate that Wilson was impaired by fatigue, injury, drugs, or alcohol.

The fourth reliability. factor is whether the witness's identification was made spontaneously and remained consistent thereafter or whether it was a product of suggestion. *Id.* at 493. Here, relevant circumstances include the length of time that passed between the witness's observation at the time of the event and the identification of defendant; the witness's mental capacity and state of mind at the time of the identification; the witness's exposure to opinions, descriptions, identifications, or other information from other sources; instances when the witness or other eyewitnesses to the event failed to identify defendant; instances when the witness ·or other eyewitnesses gave a description of the actor that is inconsistent with defendant; and the circumstances under which defendant was presented to the witness for identification. *See id.* at 494 n. 8.

The identification took place from thirty minutes to an hour after the crime, so the elapsed time was minimal. Aside from the normal agitation that would result from being robbed, nothing in the record indicates that Wilson's mental capacity and state of mind influenced his identification of Ramirez. At the time of the identification, Wilson was aware that at least one of the other two victims of the robbery had not identified Ramirez, but he was not otherwise exposed to other identifications or opinions. Neither of the other two victims of the robbery, including Davis, who initially gave an equally detailed description of the gunman to the police, identified Ramirez as the gunman.

With regard to the consistency of the descriptions given by the witnesses, it is evident that the descriptions are somewhat confused. Wilson described the gunman as a male Mexican, five feet nine inches to six feet tall, wearing a blue sweater and Levi's, with a white scarf around the lower part of his face. He described the pipe man in more detail: male Mexican, twenty-one to twenty-two years old, five feet seven inches to five feet eight inches tall, 155 to 160 pounds, shaggy brown hair, brown eyes, wearing a blue sweater and Levi's and a white scarf over the lower part of his face, one front tooth missing, and a bald

spot on the side of his head. John Davis described the gunman as eighteen to nineteen years old, five feet six inches tall, slender, brown eyes, and wearing a red and white cap. Davis also described the pipe man in more detail: eighteen to nineteen years old, slender, short dark hair, brown eyes, and wearing a white bandana and a red and white baseball cap. Davis did not describe the clothing of either robber. At the time of his arrest, Ramirez was wearing Levi's, a blue sweatshirt with paint spattered on the front but which may have been worn inside out, and a brown baseball cap. Ramirez also had readily visible tattoos on his arms. At the suppression hearing, Wilson stated positively that the gunman wore no hat, although he testified at trial that he was not sure whether the gunman wore a hat. Wilson did not mention any tattoos at the time of the robbery or at the suppression hearing but at trial, for the first time, asserted that he had seen tattoos on the gunman.

Finally, and most critically for purposes of this case, we address suggestibility, "whether the witness's identification was ... the product of suggestion." *Long,* 721 P.2d at 493; *see also id.* at 494 n. 8; *Wulffenstein,* 657 P.2d at 291–92; *Malmrose,* 649 P.2d at 59; *McCumber,* 622 P.2d at 357. The identification took place on the street in the middle of the night. Ramirez, with dark complexion and long hair, was the only person at the showup who was not a police officer. He stood with his hands cuffed to a chain link fence behind his back. The headlights of several police cars were trained on him. The witnesses viewed him from the back seat of a police car. And while the remarks of the police officers prior to the showup were to the effect that they had apprehended someone who fit the description of one of the robbers may not of themselves be unnecessarily suggestive, they must be considered as part of the circumstances surrounding the identification.

Having considered all the factors, we find this to be an extremely close case. The blatant suggestiveness of the showup is troublesome and is compounded because none of the witnesses, including Wilson, ever saw the full face of the gunman. Furthermore, Wilson claimed to have identified Ramirez principally by his eyes, the only part of the gunman's face that any of the witnesses could have seen, but gave contradictory testimony about whether the gunman wore a hat, which would seem to affect a witness's view of the gunman's eyes. The differences in racial characteristics between Wilson and Ramirez raise additional questions about the identification, although because the identification was based principally on the eyes, physical size, and clothing, these racial factors may have been of relatively little importance.

The trial court apparently resolved the contradictions in the testimony in Wilson's favor and was persuaded that Wilson observed the gunman closely enough, including his eyes and clothing, to identify him less than an hour after the robbery. Considering the facts in the light most favorable to the trial court's decision and giving due deference to the trial judge's ability to appraise demeanor evidence, we cannot say that Wilson's testimony is legally insufficient when considered in light of the other circumstances to warrant a preliminary finding of reliability and, therefore, admissibility. This leads to the conclusion that the trial court did not err by admitting the identification in violation of Ramirez's right to due process of law under article I, section 7 of the Utah Constitution.

Having found no violation of article I, section 7, we address the question of whether the trial court's admission of the identification denied Ramirez his due process rights under the fourteenth amendment to the United States Constitution. This requires little analysis. As noted above, we think that our article I, section 7 analysis is certainly as stringent as, if not more stringent than, the federal analysis required by *Biggers.* Therefore, because we have found article I, section 7 satisfied, we see no need to perform a separate *Biggers* federal analysis. *Cf. Blue Cross & Blue Shield of Utah v. State,* 779 P.2d 634, 637 (Utah 1989); *Mountain Fuel Supply Co.,* 752 P.2d at 890; *Malan v. Lewis,* 693 P.2d 661, 670 (Utah 1984).

We next consider Ramirez's argument that Officer Stuck violated his rights under the fourth and fourteenth amendments to the United States Constitution and article I, section 14 of the Utah Constitution by stopping him and detaining him for a search and interrogation. U.S. Const. amends. IV, XIV, § 1; Utah Const. art. I, § 14. Ramirez contends that the seizure was illegal because Officer Stuck did not have an objective articulable suspicion that Ramirez had committed a crime, as required by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. The State argues that the fourth amendment was not violated either because the officers' conduct did not rise to the level of a search or seizure but was a voluntary encounter between a citizen and the police or because the search or seizure was permissible as an investigation supported by a reasonable suspicion.

The parties have not argued for a separate analysis under article I, section 14 of the Utah Constitution, and therefore, we address the issue only under the federal constitution. *See State v. Fulton*, 742 P.2d 1208, 1211 n. 2 (Utah 1987), *cert. denied*, 484 U.S. 1044, 108 S.Ct. 777, 98 L.Ed.2d 864 (1988); *State v. Earl*, 716 P.2d 803, 805–06 (Utah 1986). However, that is not to suggest that a separate state constitutional analysis might not be appropriate. *See State v. Larocco*, 794 P.2d 460, 469–71 (Utah 1990).

 The federal analytical framework for determining whether a search and seizure is constitutionally permissible derives from *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See also Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640–41, 61 L.Ed.2d 357 (1979). In *Terry*, the Supreme Court held that the police may approach and temporarily detain a citizen if they can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. The analysis that emerges from *Terry* and its progeny revolves around two closely interrelated analytical components: first, the specific and articulable facts that justified the action, and second, the scope of the interference. *Id.* at 19–20, 88 S.Ct. at 1878–79.

Before one needs to address either of the *Terry* elements, however, one must determine as a threshold matter whether the encounter rises to the level of an encounter that is cognizable by the fourth amendment, i.e., whether it is a search or seizure, or merely a casual encounter between a police officer and a citizen. Such a casual encounter may even include some questioning. *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *see State v. Deitman*, 739 P.2d 616, 618 (Utah 1987) (police officer justified in asking for identification and explanation of presence in area, and evidence recovered as a result of defendant's voluntary responses admissible).[4] But "if the person refuses to answer and the police take additional steps ... to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." *Id.* at 216–17, 104 S.Ct. at 1763. It is only at this point that *Terry*'s fourth amendment analysis comes into play.

In discussing the first element of *Terry*, what constitutes reasonable and articulable facts, the Supreme Court has said that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra*

---

4. This court's decisions in *State v. Swanigan*, 699 P.2d 718, 719 (Utah 1985), and *State v. Carpena*, 714 P.2d 674, 675 (Utah 1986), are inapposite here, as they were in *State v. Deitman*, 739 P.2d 616, 618 (Utah 1987). As we stated in *Deitman*, neither *Swanigan* nor *Carpena* raised or addressed the question of whether the stop went beyond a "casual encounter" or "level-one" stop, the least restrictive of the three types of stops delineated in *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). Instead, both cases assumed that the level of the stop was sufficient to invoke *Terry*. In the present case, on the other hand, the trial court has not made sufficient factual findings to allow us to determine whether the initial stop by Officer Stuck involved a mere level-one "casual encounter" stop or a more restrictive stop, requiring a reasonable suspicion based on objectively verifiable facts.

*v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) (citations omitted); *see also Wilson v. Superior Court of Los Angeles County,* 34 Cal.3d 777, 195 Cal.Rptr. 671, 670 P.2d 325, 334 (1983).

▮ With regard to the second component, the scope of the intrusion, the Supreme Court has established that if "a person has been 'seized' within the meaning of the Fourth Amendment[, i.e.,] if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," then that seizure must have been premised on specific and articulable facts, together with rational inferences from those facts, which warrant the intrusion. *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (footnote omitted); *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326–27, 75 L.Ed.2d 229 (1983); *see* 3 W. LaFave, *Search and Seizure* § 9.2(h) (2d ed.1987). Seizure may be implemented by either "physical force or a show of authority." *Mendenhall,* 446 U.S. at 553, 100 S.Ct. at 1877. The test for when the seizure occurred is objective and depends on when the person reasonably feels detained, not on when the police officer thinks the person is no longer free to leave. *See United States v. Hall,* 421 F.2d 540, 544 (2d Cir. 1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970); 3 W. LaFave at § 9.2(h).

▮ We further note that in considering the lawfulness of the stop and the seizure and search, the trial court should regard with caution any claim that the suspect "consented." The realities of interactions between private citizens and the police are such that "consent" is often merely a fiction, particularly when it results from illegal police conduct. *See State v. Arroyo,* 796 P.2d 684, 689–90 (Utah 1990); 3 W. LaFave at § 9.2(h).

Our cases applying the federal fourth amendment standard for determining whether a seizure has occurred and was constitutionally justified have followed the *Terry* and *Mendenhall–Royer* analysis. *See, e.g., State v. Schlosser,* 774 P.2d 1132, 1135 (Utah 1989) (traffic stop); *State v. Mendoza,* 748 P.2d 181, 182–83 (Utah 1987) (traffic stop); *State v. Christensen,* 676 P.2d 408, 412 (Utah 1984) (detention without search); *State v. Whittenback,* 621 P.2d 103, 105 (Utah 1980) (search of person and car).[5]

▮ If a seizure occurs and the police are unable to point to the specific and articulable facts that justified that seizure, the seizure violates the fourth amendment of the United States Constitution, and evidence obtained as a result of the illegal seizure must be excluded. *Terry,* 392 U.S. at 15, 88 S.Ct. at 1876–77. The exclusionary rule applies not only to evidence obtained directly as a result of the illegal seizure, but also to evidence obtained by exploitation of the illegality, unless the evidence was obtained by means " 'sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963) (quoting Maguire, *Evidence of Guilt* 221 (1956)); *Arroyo,* 796 P.2d at 690 (quoting *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417–18). Because Wilson's identification of Ramirez was a direct result of the seizure of Ramirez, it and other evidence obtained through exploitation of the seizure must be suppressed if the seizure was illegal.

▮ In this case, the trial court continued the pretrial and trial motions to suppress the evidence obtained as a result of the seizure. The record contains no express ruling on this claim. As noted earlier in this opinion, at the conclusion of trial, after conviction, the court denied a new trial motion that was based in part upon a renewal of the claim of an unlawful stop

---

5. The Utah legislature essentially has adopted the *Terry* standard by statute:

 A peace officer may stop any person in a public place when he [or she] has a reasonable suspicion to believe he [or she] has committed or is in the act of committing or is attempting to commit a public offense and may demand his [or her] name, address and an explanation of his [or her] actions.

Utah Code Ann. § 77-7-15 (1990).

and seizure. But the record contains no explicit ruling on the earlier motions made on the same ground. It appears that rather than ruling on the earlier motions to suppress, the trial judge simply refrained from passing on the issue and let the evidence resulting from the stop and seizure go to the jury. The effect was the same as a denial of the motion, but a denial without the active participation of the court. As discussed earlier in this opinion, when the issue is raised, the trial court bears the responsibility to resolve preliminary constitutional issues as to the admissibility of evidence, and it cannot abdicate this responsibility by de facto leaving the question to the jury. That seems to be what occurred here.

The failure of the court to timely and explicitly address the pretrial motion presents us with a difficult problem. Disposition of the motion required that the court preliminarily resolve a number of conflicts in the testimony of Officers Stuck and Rackley and between the testimony of Ramirez and Stuck before it could have a factual foundation for considering whether a constitutional seizure occurred and, if so, whether it was lawful. *See generally INS v. Delgado*, 466 U.S. at 216–17, 104 S.Ct. at 1762–63. Under rule 12(c) of the Utah Rules of Criminal Procedure, the resolution of such factual questions is supposed to be made by record findings. "A motion made before trial shall be determined before trial unless the court for good cause orders that the ruling be deferred for later determination. Where factual issues are involved in determining a motion, the court shall state its findings on the record." Utah R.Crim.P. 12(c). No such findings appear of record.

The trial court's failure to make specific findings of fact to support a ruling is critical to this case. Not only does Stuck's version of the facts conflict with Ramirez's, as outlined earlier in this opinion, but also the testimony of the officers is inconsistent. Stuck testified that prior to Rackley's arrival, he had no reason to suspect that Ramirez was involved in any criminal activity except that the man who had been walking near Ramirez had run away. Stuck also testified that prior to the time Rackley brought news of the Pizza Hut robbery, he had no reason to think that Ramirez might be armed, so there was no justification for a weapons search. To recapitulate, Officer Stuck maintained that Ramirez voluntarily submitted to the stop until after Officer Rackley arrived with information about the robbery, but at trial, he testified that he had searched Ramirez before Rackley arrived, an act inconsistent with his claim of a voluntary encounter rather than a constitutional seizure. Consistent with this statement and inconsistent with a lawful *Terry* stop is Rackley's testimony that Stuck had already put handcuffs on Ramirez before Rackley handcuffed him to the fence. The implication is that the encounter was not voluntary, or had ceased being voluntary, and that Ramirez was seized before Rackley arrived.

Because of these contradictions in testimony, it was critical for the trial judge to make an explicit ruling on the seizure prior to trial and to enter findings in the record resolving these factual disputes. The credibility questions are more complex than simply resolving a conflict in testimony between defendant and the officers; the testimony of the police officers conflicts and is, to a degree, inconsistent with any finding of a constitutional stop and seizure.

■ This court has held that in cases in which factual issues are presented to and must be resolved by the trial court but no findings of fact appear in the record, we "assume that the trier of facts found them in accord with its decision, and we affirm the decision if from the evidence it would be reasonable to find facts to support it."[6]

---

6. This court in *Acton v. Deliran*, 737 P.2d 996 (Utah 1987), stated, "Failure of the trial court to make findings on all material issues is reversible error unless the facts in the record are 'clear, uncontroverted, and capable of supporting only a finding in favor of the judgment.'"

*Id.* at 999 (quoting *Kinkella v. Baugh*, 660 P.2d 233, 236 (Utah 1983)). The court of appeals apparently relied on this statement of the standard in its recent decision in *State v. Harrison*, 805 P.2d 769, 784 n. 26 (Utah Ct.App.1991). *Acton's* precise wording of the standard, how-

*Mower v. McCarthy*, 122 Utah 1, 6, 245 P.2d 224, 226 (1952); *see also Seal v. Mapleton City*, 598 P.2d 1346, 1348 (Utah 1979); *Mojave Uranium Co. v. Mesa Petroleum Co.*, 22 Utah 2d 239, 244 n. 7, 451 P.2d 587, 591 n. 7 (1969). If the ambiguity of the facts makes this assumption unreasonable, however, we remand for a new trial. *See Darger v. Nielsen*, 605 P.2d 1223, 1225 n. 2 (Utah 1979); *Christensen v. Abbott*, 595 P.2d 900, 903 (Utah 1979); *Quagliana v. Exquisite Home Builders, Inc.*, 538·P.2d 301, 305 (Utah 1975); *Thomas v. Farrell*, 82 Utah 535, 542–43, 26 P.2d 328, 330–31 (1933). As the court of appeals recently noted in reviewing a search and seizure decision, "[T]he issues presented in search and seizure cases are highly fact sensitive.... Thus, detailed findings are necessary to enable this court to meaningfully review the issues on appeal." *State v. Lovegren*, 798 P.2d 767, 770 (Utah Ct. App.1990) (citations omitted).

In the present case, the record evidence certainly does not clearly support a ruling that the stop and seizure was lawful. *See id.* at 770–71. In fact, only the most selective picking and choosing from among the officers' testimony could support such a conclusion. Under these circumstances, we cannot conclude that it would be reasonable to assume that the trial judge made such findings. This seems to fortify our conclusion, based on the way the motion to suppress was handled, that this is a situation where the trial judge permitted the evidence of the stop and seizure and the fruits of that stop, including the eyewitness identification, in evidence without determining its constitutional admissibility. This was error.

■ The next question is what the consequence of this error should be. First, the error is plainly harmful under rule 30 of the Utah Rules of Criminal Procedure. Utah R.Crim.P. 30. Absent the identification by Wilson, which flowed from the stop and seizure, the State would have had no case against Ramirez. There is, therefore, a reasonable likelihood of a more favorable result had the identification not been admitted. *See, e.g., State v. Knight*, 734 P.2d 913, 919 (Utah 1987).

Second, having found the error harmful, we must fashion a remedy. In certain circumstances where a trial judge has failed to enter findings and conclusions, it is sufficient for us to remand a case for their entry. *See Acton v. Deliran*, 737 P.2d at 999. However, in the present case the failure to make findings is not a mere technical oversight that makes it difficult for us to adequately review the trial court's ruling. *See, e.g., Lovegren*, 798 P.2d at 771–72. Instead, we have the failure of the judge to address the factual questions and to make the legal determinations that were a prerequisite to the admission of the eyewitness identification essential to the con-

---

ever, is not entirely accurate. It is true that *Kinkella v. Baugh*, upon which the *Acton* court relied, did find the trial court's failure to make findings harmless because the facts in the record were "clear, uncontroverted, and capable of supporting only a finding in favor of the judgment." *Kinkella*, 660 P.2d at 236. However, *Kinkella* did not say that in all other circumstances, a failure to make findings on all material issues is reversible error. Rather, it is only *one* ground for *avoiding* reversal for not making such findings. In finding the error harmless, the *Kinkella* court cited Corpus Juris Secundum, which lists the "clear and uncontroverted" standard as only one of several ways to avoid reversing a trial court that fails to make findings. *See* 5B C.J.S. *Appeal and Error* § 1790 (1958). Furthermore, this court has recognized many of the other ways C.J.S. lists as ways to avoid reversing such a trial court. *See, e.g., Sorenson v. Beers*, 614 P.2d 159, 160 (Utah 1980) (trial court upheld where requisite factual find-

ings that were not made would only make explicit what was already implicit in other findings); *Seal v. Mapleton City*, 598 P.2d 1346, 1348 (Utah 1979) (presumption that trial court found facts necessary to support judgment); *Farrell v. Turner*, 25 Utah 2d 351, 355, 482 P.2d 117, 119 (1971) (even without requisite findings, trial court will be upheld if there is competent evidence to support ruling); *Mojave Uranium Co. v. Mesa Petroleum Co.*, 22 Utah 2d 239, 244 n. 7, 451 P.2d 587, 591 n. 7 (1969) (presumption that findings, if made, would be in harmony with decision); *Mower v. McCarthy*, 122 Utah 1, 6, 245 P.2d 224, 226 (1952) (absent findings we affirm if it would be reasonable to find facts to support conclusion).

In summary, the general rule is best and most inclusively stated as it was set forth in *Mower:* this court upholds the trial court even if it failed to make findings on the record whenever it would be reasonable to assume that the court actually made such findings.

viction. To ask the trial court to address the admissibility question now would be to tempt it to reach a post hoc rationalization for the admission of this pivotal evidence. Such a mode of proceeding holds too much potential for abuse. The only fair way to proceed is to vacate defendant's conviction and remand the matter for retrial. This will permit a trial judge to address properly the constitutional admissibility question and enter appropriate findings and conclusions. We therefore vacate the conviction and remand for a new trial.

We have considered Ramirez's other claims and have found them to be without merit.

HALL, C.J., HOWE, Associate C.J., and DURHAM, J., concur.

STEWART, J., dissents; opinion to follow.